ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC., Building Industry Association of California, Inc., and Engineering and Grading Contractors Association, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Joint Council of Teamsters No. 42, General Teamsters and Food Processing Union, Local No. 87, Sales Drivers & Dairy Employees Union, Local No. 166, Chauffeurs, Teamsters & Helpers Union, Local No. 186, General Truck Drivers Union, Local No. 235, Teamsters & Warehousemen Union, Local No. 381, Building Material & Dump Truck Drivers Union, Local No. 420, General Truck Drivers, Chauffeurs & Helpers Union, Local No. 898, and General Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 982, all affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Associated Independent Owner-Operators, Inc., and California Dump Truck Owners Association, Intervenors.

TEAMSTERS LOCAL UNION NOS. 137, 150, 216, 287, 291, 386, 431, 439, 490, 315, 624, 684, 890, 912 and 980, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America and Heavy, Highway, Building and Construction Teamsters Committee of Northern California, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

ASSOCIATED INDEPENDENT OWNER–OPERATORS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 75–3157, 75–3370 and 75–3580.

United States Court of Appeals,
Ninth Circuit.

Oct. 11, 1977.

Rehearing and Rehearing En Banc
Denied Dec. 30, 1977.

John H. Stephens (argued) of Cox, Castle, Nicholson, Weeks, Los Angeles, Cal., Kenneth N. Silbert (argued) of Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., Alvin Slaight, Jr. (argued) of Paul, Hastings & Janofsky, Newport Beach, Cal., for petitioners.

Carol Dedeo, Atty. (argued), N. L. R. B., San Francisco, Cal., for respondent.

Before BARNES and SNEED, Circuit Judges, and WONG,* District Judge.

SNEED, Circuit Judge:

Associated General Contractors of California, Inc. (AGC), Building Industry Association of California, Inc. (BIA), and Engineering and Grading Contractors Association, Inc. (EGCA) (jointly referred to as "Employers"), Teamsters Local Union No. 137, et al. (Northern California Unions), and the Associated Independent Owner-Operators, Inc. (AIOO), petition this court under section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (Act) to review a decision and order of the National Labor Relations Board (Board). The Joint Council of Teamsters No. 42, et al., (Southern California Unions) and the California Dump Truck Owners Association (CDTOA) have intervened, and the Board has filed a cross-application for enforcement. In the decision and order, the Board found that the Employers had engaged in unfair labor practices within the meaning of sections 8(a)(1) and (2) of the Act, 29 U.S.C. §§ 158(a)(1) and (2),[1] by entering into, maintaining and enforcing contracts with the Unions at a time when a real question concerning the representation of the employees existed. It is reported at 220 N.L.R.B. 93.

## I. *Facts.*

The AGC, BIA and EGCA are voluntary associations of employers engaged in the building and construction industry. They represent their employer-members in negotiating and administering collective bargaining agreements; all three represent employers in their negotiations with the Southern California Unions and the AGC and EGCA represent employers in negotiations with the Northern California Unions.

The Employers use dump trucks and other vehicles in the course of their construction businesses. These vehicles are operated either by driver-employees, who are employed in the traditional sense and who are represented by the Union,[2] or owner-operators, who are represented by the AIOO and the CDTOA. The fundamental issue around which this litigation swirls is whether these owner-operators should be classified as self-employed independent contractors or employees of the Employers.[3]

Prior to 1971, the Master Labor Agreement (MLA) negotiated by the Employers and the Unions did not cover owner-operators. In 1970, the Unions obtained a modification of the MLA, which was executed in January, 1971, that would subject the owner-operators to Union control by expanding the coverage of the MLA to include owner-operators as employees. This modification prompted three owner-operators to file decertification petitions with the Board on February 26, 1971, seeking elections in their respective bargaining units and decertification of the incumbent Unions as sole bargaining representatives of construction industry employees.

The Board held hearings on these decertification petitions in which the parties presented conflicting contentions as to the

---

* Honorable Dick Yin Wong, United States District Judge for the District of Hawaii, sitting by designation.

1. Sections 8(a)(1) and (2) provide that
    (a) It shall be an unfair labor practice for an employer—
        (1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
        (2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permit-

ting employees to confer with him during working hours without loss of time or pay.

2. The status of these driver-employees is not at issue, nor is their representation by the Unions questioned.

3. Neither the parties nor this litigation is a newcomer to this Court. The AIOO previously challenged in district court the Board's finding with respect to the employment status of the owner-operators and attempted to have the election enjoined. The district court dismissed the case for lack of jurisdiction and we affirmed. *Bays v. Miller,* 524 F.2d 631 (9th Cir. 1975).

status of the owner-operators. On January 17, 1973, the Board rendered its decision in which it held that the owner-operators were "employees" within the meaning of the Act, that they were entitled to participate in an election, and that a question concerning the representation of the employees existed. 201 N.L.R.B. 311. The Board also remanded the cases to the Regional Director to determine the scope of the bargaining units and the eligibility of the employees. After hearings on these issues, on March 5, 1974 the Board issued a Supplemental Decision and Direction of Election, which held, *inter alia* that owner-operators were properly included with driver-employees in the same bargaining unit and which directed elections by mail in the separate Northern and Southern California units. 209 N.L.R.B. Nos. 61, 62.

In July 1974, in the midst of election proceedings in the northern and southern regions, the Employers entered into new collective bargaining agreements, which covered the owner-operators, with the Unions. Almost immediately thereafter, the owner-operator associations, the AIOO and the CDTOA, filed unfair labor practice charges against the Employers. The Board suspended further processing of the elections pending the determination of the unfair labor practice charges.[4]

The Board consolidated these charges and held hearings in January, 1975. In September, 1975 the Board rendered the ·decision now on appeal, finding violations of sections 8(a)(1) and (2) and ordering, *inter alia,* the Employers to cease and desist from further bargaining with the Unions and from enforcing the 1974 contract until the Unions proved their majority representation status in a Board conducted election.

## II. *The Contentions.*

The parties bring several issues to this court for review. The first, not surprisingly, deals with the problem of whether the owner-operators are independent contractors or employees. This issue, however, divides itself into two parts: first, whether this court may even reach the issue at this stage and second, whether the Board properly classified the owner-operators as employees. The Employers and the owner-operators here join forces and contend that this court may consider the issue in its review of the unfair labor practice charge and that this court should reverse the Board's finding as to the. status of the owner-operators. Inasmuch as this finding underlies the unfair labor practice charge, the Employers and owner-operators seek a remand of the unfair labor charge to the Board. On the other hand, the Board and the Unions insist that this court may not reach the issue because the finding was made in the course of a representation investigation under section 9(c), 29 U.S.C. § 159(c).

The second issue presented by the parties is whether, assuming the owner-operators were properly classified as employees, the evidence was sufficient to support the Board's finding that a real question existed concerning the representation of the majority of the employees. On this· issue, the owner-operators align themselves with the Board in support of the Board's finding, whereas the Employers and the Unions stand shoulder to shoulder and argue that the evidence did not support such a finding.

The AIOO also complains of the Board's remedy for the unfair labor practice. It argues that its members are entitled to recover certain losses incurred as a result of the Employers' entering into collective bargaining agreements with the Unions. In addition, it contends that the Board should not have permitted the Employers to continue to recognize the Unions as representatives of the employees.

For the reasons hereafter stated, we hold that appellate review of the issue of the employment status of the owner-operation

---

4. In the southern region, the Board had prepared eligibility lists and had mailed the ballots to the eligible voters. In the northern region, eligibility lists were being prepared. Upon the filing of the unfair labor practice charges, the Board impounded all the votes it had received and discontinued any further proceedings in the elections.

is proper under the circumstances of this case and we conclude that under the facts before us, the owner-operators appropriately should be classified as independent contractors, not employees. This holding makes it unnecessary to reach the remaining issues. We deny enforcement of the Board's order and remand the cases to the Board for further consideration of the unfair labor practice charges in the light of this opinion.

### III. *Availability of Appellate Review.*

The parties focus their respective arguments as to whether this court may review the Board's finding with respect to the employment status of the owner-operators on the proper interpretation of section 9(d) of the Act, 29 U.S.C. § 159(d), which provides

> (d) Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

The Board contends that this section permits review of rulings made by the Board in representation proceedings only after the Board has (1) held an election, (2) certified the results and (3) ordered the employer to do something based on these election results. It relies heavily on the Supreme Court's decision in *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), where the Court observed "the purpose of § 9(d) was to provide 'for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election.'" *Id.* at 478–79, 84 S.Ct. at 897–98. Inasmuch as the three prerequisites to appeal have not been satisfied, the Board argues, this court may not review the Board's finding. The owner-operators, however, insist on what they consider to be a more practical application of section 9(d). They contend that because the record of the representation case is included in the record of this unfair labor practice case [5] and was the basis for the finding that an unfair labor practice had been committed, section 9(d) is satisfied and this court may consider the matter. While conceding that findings in representation proceedings generally are reviewable in the context of a review of an unfair labor charge based on a refusal to bargain with a certified bargaining representation under section 8(a)(5), 29 U.S.C. § 158(a)(5), the owner-operators argue that such findings are also reviewable in the course of a review of other unfair labor practice charges, such as the sections 8(a)(1) and (2) charges in these cases.

We agree with the Board in that section 9(d) in itself does not allow us to review this ruling of the Board. Nonetheless, we conclude that we may review the Board's finding, under section 10(f), 29 U.S.C. § 160(f), in conjunction with our review of the unfair labor practice charges now before us, and that this review is not precluded by section 9(d).

The legislative history of section 9(d) supports our reasoning. Prior to the enactment of section 9(d) in 1935, direct review of election orders prior to the election was permitted. This allowed employers to engage in dilatory tactics aimed at weakening the position of the unions, whose influence tended to wane as the election was postponed pending court review. *See* 79 Cong. Rec. 7569 (1935) (remarks of Sen. Wagner). To remedy this defect, Congress passed section 9(d). By its enactment, Congress intended to abolish direct review of the repre-

---

5. The parties introduced the record of the representation case into evidence at the hearing below, and it is a part of the record before us.

sentation findings, replacing it with a method of indirect review whereby an employer faced with a Board order relating to an unfair labor practice based on the results of an election could obtain review of the underlying representation proceeding indirectly through the review of the unfair labor practice decision. It is clear that Congress did not contemplate direct review of representation proceedings *prior to* an election. S.Rep. No. 573–74, 74th Cong., 1st Sess., 14 (1935). *See Boire v. Greyhound Corp., supra; A. F. of L. v. N.L.R.B.*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). Instead, Congress struck a balance which would prevent undue interference with the election process with its attendant detrimental effect on labor relations but which also would provide for eventual review of the representation proceedings. *See* H.R.Rep. No. 969, 74th Cong., 1st Sess., 5, 20–21 (1935) H.R.Rep. No. 972, 74th Cong., 1st Sess., 5–6, 20–21 (1935).

Congress reaffirmed its belief in this balance during the passage of the Labor Management Relations Act of 1947. The House proposed an amendment to section 10(f) which would allow "any person aggrieved by a final order of the Board [including an order of certification under section 9]" to appeal. This amendment sought to cure the unfairness of the present system, in which many of the parties are without an effective avenue of appeal, by giving any aggrieved person the right to a direct appeal from the election order.[6] The amendment was rejected because it would permit the same dilatory tactics used prior to 1935. 93 Cong.Rec. 644 (1947) (remarks of Sen. Taft).

█ In sum, the intended thrust of section 9(d) was aimed at the prohibition of *direct* review of certification orders; *indirect* review at some point was clearly envisioned. Taken in this context, comments such as "Section 9(d) *makes it absolutely* clear that there shall be no right to court review anterior to the holding of an election," S.Rep. No. 573, 74th Cong., 1st Sess., 14 (1935) must be viewed as merely restating the intention of Congress to deny *direct* review of certification orders. It does not follow that indirect review of representation proceedings prior to an election is prohibited.

*N.L.R.B. v. Falk Corp.*, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396 (1940), is not to the contrary. In that case, the Board, in a consolidated proceeding, (1) had found that the employer had committed an unfair labor practice by fostering and dominating a company union and (2) had directed an election to be held without the participation of the company union. The court of appeals granted enforcement of the Board's order to cease dominating and to disestablish the company union. However, on its own volition, it ordered that the employees in a future election should be free to choose the company union. The Supreme Court primarily was concerned with only the latter holding.

The Court held that section 9(d) did not authorize "such anticipatory judicial control of election methods." Inasmuch as none of the Board's orders was " 'based in whole or in part upon facts certified' as the result of an election," *N.L.R.B. v. Falk Corp.*, 308 U.S. at 459, 60 S.Ct. at 311, the court of appeals was powerless to modify the election proceeding. The Court limited the power of the court of appeals under section 9(d) to review of Board orders based on an *actual* certification of a bargaining representative.

> The proposed election here has not even been held and consequently no certification of a proper bargaining agent has been made by the Board. Until that election is held, there can be no certification of a bargaining representative and no Board order—based on a certification, has been or can be made, so as to invoke the court's powers under 9(d).

---

**6.** This [the current] procedure is unfair to everyone; the Union that wins, which frequently must wait for months to exercise its rights; the union that loses, which has no appeal at all no matter how wrong the certification

may be; the employees, who have no appeal; and the employer, for whom an appeal involves great risks.

H.R. No. 245, 80th Cong., 1st Sess., 43 (1947).

N.L.R.B. v. Falk Corp., 308 U.S. at 459, 60 S.Ct. at 311.

Under the Court's reasoning (contrary to the owner-operators contention at oral argument) "facts certified" are limited to those actually certified after an election, viz., the certification of the bargaining unit, bargaining representative, etc., and do not include any facts which the Board may "certify" as part of the record. The Court spoke unequivocally when it said:

> There can be no court review under 9(d) until the Board issues an order and requires the employer to do something predicated upon the result of an election.
>
> Since this employer has not been ordered by the Board to do anything predicated upon the results of an election the court had no authority to act under 9(d).

Id.

Although section 9(d) provides no authority to consider the owner-operator issue, it also does not preclude reaching the issue in the context of the independent unfair labor practice under section 10(f). The basis for this conclusion resides in Falk. The pivotal finding there was that the employer fostered and dominated the company union. This finding provided the basis for the Board's unfair labor practice holding, which holding was reviewed by the court of appeals in the course of deciding that the Board's order to cease dominating and to disestablish the company union should be enforced. The Supreme Court recognized

that the court of appeals had jurisdiction to review the Board's unfair labor practice holding and in the course of that review, to determine whether the Board had correctly found that the employer fostered and dominated the company union. Had it not so recognized jurisdiction it would have pointed out that the circuit court's enforcement of the unfair labor practice order was a brutum fulmen. No such indication was given. Moreover, nothing in Falk indicates that the circuit court's power was limited to enforcement only.

Here, the pivotal finding by the Board was that owner-operators are employees. This finding was the basis for conducting an election in which the bargaining unit included owner-operators. It also was the basis for the unfair labor practice of bargaining with a union when a question concerning representation exists. In reviewing the Board's unfair labor practice holding under the authority of section 10(f) we must determine whether the Board correctly held the owner-operators to be employees. In doing so we are merely doing what the court of appeals in Falk did when it reviewed the facts and enforced the Board's order to cease dominating and to disestablish the company union.[7] Our jurisdiction, however, is limited to the unfair labor practice proceedings. Under Falk, we have no jurisdiction to review any order in connection with the representation proceedings.[8]

7. The case before us admittedly is distinguishable from Falk in terms of the chronology of events. In Falk, the two proceedings were held simultaneously, whereas in our case the representation case preceded the unfair labor case. This is a distinction without a difference. To illustrate, assume that in Falk, the representation case was heard first, and the Board found that the employer had fostered and dominated the company union and therefore the Board would not place the company union's name on the ballot. Then, because of this finding, an unfair labor practice charge was heard, relying mainly on the earlier finding in the representation proceeding. To allow this procedural difference to deprive this court of the power to reach the controlling issue in this case places form over substance.

We do note one other difference. In the instant case, it was the employers' action taken

after the Board's finding that precipitated the unfair labor practice charge. In Falk, the employer's actions preceded both the representation proceeding and the unfair labor practice proceeding. This difference should not change the result because it is not relevant to the issue before us, to wit, whether this court may consider a finding made in a representation proceeding in the course of its review of an unfair labor practice charge when the representation proceeding is incorporated into the unfair labor practice proceeding.

8. To illustrate further, we turn to the Fourth Circuit decision in E. I. Dupont De Nemours & Co. v. N.L.R.B., 116 F.2d 388 (4th Cir. 1940), cert. den. 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529 (1941), which relies heavily on Falk. As in Falk, the Board, in consolidated unfair labor practice and representation proceedings, had

Holding as we have that in the context of the unfair labor practice charge we may consider the issue of whether the owner-operators are properly considered employees or independent contractors, we now turn to the merits of this problem.

IV. *Reversal of the Board's Finding.*

The facts relating to the independent contractor-employee controversy are not in question. We need only determine (1) whether the Board employed the correct legal standard in deciding this question and (2) if so, was this legal standard properly applied.

■ For the purposes of section 2(3) of the Act, 29 U.S.C. § 152(3), the term "employee" does not include "any individual having the status of an independent contractor." In distinguishing between the two, both the Board and the courts must apply general agency principles, *N.L.R.B. v. United Insurance Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), such as those found in the *Restatement (Second) of Agency* § 220(2) (1957). *Associated Independent Owner-Operators, Inc. v. N.L.R.B.*, 407 F.2d 1383 (9 Cir. 1969). Of the considerations employed in reaching a decision under general agency law, the determination of who has the right to control and direct the work is foremost. *SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d 354 (9th Cir. 1975); *Associated Independent Owner-Operators, Inc. v. N.L.R.B.*, supra. It must be tempered, however, by other considerations relevant to the relationship in its entirety. *N.L.R.B. v. United Insurance Co.*, supra. Although the Board applied this "right-of-control" test, we disagree with its application of the test and its apparent failure to give sufficient weight to other indicia of independent contractor status.

■ Yet simple disagreement with the Board does not mandate reversal. We may not reverse the Board simply because we might have decided the case differently were it tried before us *de novo, N.L.R.B. v. United Insurance Co.*, supra, nor may we reverse if the board has chosen between two fairly conflicting views of the issue. *N.L.R.B. v. United Insurance Co.*, supra; *SIDA of Hawaii, Inc. v. N.L.R.B.*, supra; *Associated Independent Owner-Operators, Inc. v. N.L.R.B.*, supra. On the other hand, if the Board decision that the owner-operators are employees lacks substantial support in the record considered as a whole, we must reverse. Inasmuch as the determination of this issue will depend on the particular facts of the case, we shall first describe the factual setting before us.[9]

The owner-operators own and operate dump trucks and perform hauling services for contractors. They deal either directly with the contractor or through an overlying carrier, who contracts with the contractor to provide hauling services and in turn subcontracts this work to the owner-operators for a fee of 5% of the minimum tariff for the work. An owner-operator generally will have such subcontractual, or subhaul, agreements with various overlying carriers; conversely, an overlying carrier will have subhaul agreements with various owner-operators. The overlying carriers do not supervise in any significant fashion the work of the owner-operators. Rejection of referrals from overlying carriers is common; an owner-operator often will turn down work he believes is too dangerous, unprofitable or that simply does not fit into his schedule.

found that the employer had committed an unfair labor practice by dominating a company union and therefore the Board excluded the company union from the ballot. The court of appeals reversed the Board on the unfair labor practice issue, finding that the employer had not interfered with the formation or operation of the company union. Under *Falk*, however, it held that it could not review the finding as it related to the representation proceeding and consequently could not reverse the Board decision to exclude the company union from the

ballot. Similarly, we may not reverse the Board decision in the representation proceeding with respect to the inclusion of the owner-operators in the bargaining unit on the basis of our decision herein. Nevertheless, we may reverse the Board with respect to the owner-operator question as it relates to the unfair labor practice charges now before us.

9. These facts are derived from the Board's decision in the underlying representation case, reported at 201 NLRB 311.

The relationship between an owner-operator and a contractor generally is short-lived. An owner-operator may work for as many as 100 contractors in any given year, and sometimes will work for two different contractors during the course of one work day.

The California Public Utilities Commission (PUC) establishes the minimum tariff, which includes compensation for both labor and equipment. Owner-operators are free to negotiate for higher rates; the minimum tariff operates as a floor below which the rates may not fall. Owner-operators are usually paid by the hour, although sometimes their pay is based on mileage and tonnage rates. Unlike employee-drivers, who are paid on an hourly basis from the time they are told to report to work until the work day is finished, regardless of whether the equipment is in operation throughout that period, owner-operators are not paid for the time their equipment is inactive. Moreover, the contractors do not deduct state and federal income tax, social security, or disability insurance from the owner-operators' wages. The owner-operator keeps track of his own time and presents a bill for his services to the contractor or overlying carrier. This is then compared against the records kept by the contractor or overlying carrier to prevent padding of the bill.

Under the regulations of the PUC, the owner-operators must obtain a permit issued by the PUC, be bonded, and carry sufficient liability insurance. In addition, owner-operators are responsible for any traffic citations for overloading and spillage.

An owner-operator bears the entire cost of his enterprise. This usually includes his trucking equipment ($15,000 to $20,000), a service pick-up ($1,000 to $4,000), tools ($500 to $1,500), insurance premiums ($500 to $3,500), and office supplies, including for example, stationery, invoices, a typewriter and a calculating machine. In addition, he must pay all maintenance and operational expenses.

An owner-operator may hire a driver to operate his equipment, in which case he pays the driver an hourly wage and makes the standard deductions from the driver's pay. He may also subcontract the work to another owner-operator. In either case, he need not first receive permission for such substitution from, nor even report the substitution to, the contractor. If he hires a driver, this driver is under the exclusive control of the owner-operator.

At the jobsite, the owner-operators observe the same starting time, quitting time and lunch break as do employee-drivers. In most cases, the contractors direct the owner-operators where to load and to dump the materials and designate the routes to be taken. Contractors may have personnel, known as "load checkers," who oversee the performance of the owner-operators. Contractors also often have "spotters" who tell the owner-operators where to dump the material. On occasion, contractors take disciplinary actions in the form of reprimands or docking pay for an owner-operator's poor performance.

In determining that the owner-operators are employees, the Board seized on several facts relating to the owner-operators' performance of their work at the jobsite and concluded that these facts indicated that the contractors had the right to control the manner and means by which the desired result was accomplished and that the relationship between the parties was therefore that of employer-employee. In so concluding, the Board, although recognizing the distinction between the right to control the manner and means and the right to control only the result, failed to draw this distinction properly. Moreover, the factors relied upon by the Board are not persuasive evidence of an employer-employee relationship.

The contractors' control of the loading and dumping sites and instructions to the owner-operators as to where to pick up and dump this material demonstrates the contractor's right to control the *result* of the work, not the *manner* or *means* of doing the work. Such instructions have little to do with the actual operation of the equip-

ment, *viz.* the manner in which material is loaded, unloaded, and transported. *See Associated Industrial Owner-Operators, Inc. v. N.L.R.B., supra.* Nor does designation of the routes to be taken necessarily indicate that the contractors controlled the manner and means of accomplishing the desired result. Inasmuch as the owner-operators are paid by either the hour or by the mile, it certainly is in the contractors' best interest not to permit owner-operators to take circuitous routes to and from the jobsite. Control of this facet of the business merely prevents padding of the ultimate cost. In the same vein, neither the presence of load checkers, who make certain that the dump trucks do not take side trips, nor spotters, who direct the owner-operators where to dump the material, deprives the owner-operators of their independent status. The existence of the load checkers is simply a by-product of the method of payment. The spotters perform a function which involves primarily the final result of the owner-operator's services.

The Board also pointed to the fact that contractors reprimand owner-operators for "standing around and talking, for dumping at a site not designated by the contractor, and for taking excessively long lunch breaks" as an indication of the contractors' control. Clearly the designation of a dumping site is a part of the desired result, which is within the sphere of the contractors' control in an contractor-independent contractor relationship. *Associated Independent Owner-Operators v. N.L.R.B., supra.* As for reprimands for loafing and taking excessively long lunch breaks, these are to be expected from a contractor who wishes to complete a job on time. Such reprimands are not examples of interference with the manner and means by which an owner-operator loads his truck, transports material to a dump site, and unloads his truck.

Finally, the Board notes that the owner-operators are required to observe the same starting and quitting times and lunch breaks as the rest of the employees. Again, this is a necessary requirement by virtue of the need for cooperation among the various workmen at a construction site. Loaders load the dump trucks; the owner-operators must coordinate their work with these loaders. Such coordination would be more difficult if varying lunch hours were observed. We accorded the insignificant factor of prescribed working hours little weight in *Associated Independent Owner-Operators v. N.L.R.B., supra,* and do so again here.

Looking at the relationship in its entirety, it becomes even clearer that the owner-operators are independent contractors. Each operates an independent business of his own, *see Restatement, supra,* § 220(2)(b), in which the contractors exercise no control. *See Joint Council of Teamsters No. 42 v. N.L.R.B.,* 146 U.S.App.D.C. 275, 282, 450 F.2d 1322, 1329 (1971) (MacKinnon, J., dissenting). Each is a skilled operator. *Associated Independent Owner-Operators v. N.L.R.B., supra; Restatement, supra,* § 220(2)(d). Being entrepreneurs, each must invest substantial sums in equipment and bear the risk of any loss attributed to his operation. *See SIDA of Hawaii, Inc. v. N.L.R.B., supra; Brown v. N.L.R.B.,* 462 F.2d 699 (9th Cir.), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972). It is the owner-operator's responsibility to meet the regulations of the PUC so that he may operate legally. The success of an owner-operator depends upon his own skill and business acumen, and does not depend on that of any contractor. He may work as little as he wants or as much as he can, and for as many different contractors as will hire him. It is unlikely that he will work for any single contractor for an extended length of time. *See Restatement, supra* § 220(2)(f). He does not have a continuing relationship with a contractor in the same sense that an employee has a continuing relationship with an employer. His relationship is ongoing only in that he may do some more work for the contractor some time in the future. In short, owner-operators run businesses completely independent of the contractors, and in the main are not subject to their control. The contractors' only real concern is in the accomplishment of the job for which the owner-operators are hired, to wit, the loading, hauling and

dumping of material. Any supervisory activity of the contractors is limited to that which is necessary to accomplish this goal. *See Joint Council of Teamsters No. 42 v. N.L.R.B., supra,* (MacKinnon, J., dissenting).

There are other indicia of the independent contractor status of the owner-operators. Although paid on an hourly basis, which is usually an indication of employee status, *Restatement, supra* § 220(2)(g), the hourly rate reflects amounts attributed to the use of the equipment as well as to the value of the labor. Thus, owner-operators are not paid for the time they are on the jobsite when their equipment is idle. Moreover, the contractors do not make any of the normal deductions from the pay of the owner-operators, contrary to the practice commonly employed with respect to true employees. Also contrary to the practice used in dealing with employees, each owner-operator is free to reach his own bargain with each contractor as to the amount he is to be paid, limited only by the minimum tariff set by the PUC. We note that all of these considerations were present in *Associated Independent Owner-Operators v. N.L.R.B., supra,* where we reversed a Board decision finding owner-operators of graders employees.

In addition, owner-operators may hire substitute drivers or subcontract the work to another owner-operator without prior permission, or any notification to, the contractor. This is clearly inconsistent with a finding that a personal employer-employee relationship exists. It is further evidence that the owner-operator's truck is his exclusive domain, and that its operation is beyond the authority of the contractor.[10]

In determining whether the owner-operators are employees or independent contractors, the "total factual context" and "all the incidents of the relationship must be assessed and weighed with no one factor being decisive." *N.L.R.B. v. United Insurance Co.,* 390 U.S. at 258, 88 S.Ct. at 991. This the Board failed to do. Instead, it gave inordinate weight to isolated examples of contractor control at the jobsite, control which in the main involved only the result sought to be accomplished.[11] Given the exigencies of a construction site, the contractor's reasonable instructions as to trivial matters, such as the timing of the lunch hour, cannot transform what by every other indicia is a contractor-independent contractor relationship into an employer-employee relationship. Looking to the "total factual context" of the relationship which the owner-operators and contractors maintain, we hold that the Board erred in concluding that the owner-operators of dump trucks are employees. This holding does not depart from the spirit of our earlier holding in *Associated Independent Owner-Operators, Inc. v. N.L.R.B., supra.*

We deny enforcement of the Board's decision and order of September, 1975 and remand this case to the Board for further proceedings consistent with this opinion.

---

**10.** We also note that contractors do not give owner-operators any instructions on how to operate the dump trucks, nor do they require that the trucks be of a certain type or be maintained in any certain fashion.

**11.** We disagree with the. majority in *Joint Council of Teamsters No. 42 v. NLRB,* 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971), which held that the owner-operators of dump trucks were employees. That court found that the contractors did exercise sufficient control of the details of the work to outweigh other indicia of independent contractor status. However, we are of the opinion that the D.C. Circuit erred in two respects. First, it failed to consider the relationship as a whole, and second as was the Board in the case before us, it was blinded by presence of the contractors' right to control details of the work which were necessary only to insure a smooth running construction job and the accomplishment of the desired result.