MERCHANTS HOME DELIVERY
SERVICE, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 77–2337.

United States Court of Appeals,
Ninth Circuit.

Aug. 21, 1978.

---

Daniel J. Sullivan (argued), of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for petitioner.

Howard Perlstein (argued), Washington, D. C., for respondent.

Before MERRILL and KENNEDY, Circuit Judges, and BARTELS,* District Judge.

BARTELS, Senior District Judge:

This is a petition for review and cross-petition for enforcement of an order of the National Labor Relations Board (NLRB). Merchants Home Delivery Service (Merchants) is a California-based contract carrier with operations in twenty-two states, engaged primarily in the delivery of household appliances and furniture from department and furniture stores to the homes of the stores' customers. We are concerned here with its activities in making deliveries for J. C. Penney Co., Inc. (Penney) in the St. Louis, Missouri area. The NLRB found that Merchants violated §§ 8(a)(1) & (5) of the NLRA 29 U.S.C. §§ 158(a)(1) & (5), in refusing to bargain with the union purporting to represent the truck drivers who handle the Penney deliveries for Merchants.[1] The Board's conclusion was based on three underlying findings: (1) the truck owner-operators engaged by Merchants to perform the Penney deliveries are employees of Merchants, not independent contractors; (2) Merchants is a successor corporation to Compton Service Co. (Compton) and Am-Del-Co, Inc. (ADC), which had previously handled Penney's deliveries; and (3) the union which represented Compton's and ADC's drivers continued to enjoy majority status among Merchants' drivers, most of whom had previously worked for Compton and ADC on the Penney account. In view of our determination that Merchants' truck drivers are independent contractors excluded from coverage under the NLRA by § 2(3) of the Act, 29 U.S.C. § 152(3), we do not reach the issues of successorship and majority status.

*Facts*

For approximately nine years, from the mid-1960's through 1975, Penney had its merchandise delivered by Compton. By 1974, Penney, which also stored its merchandise in a warehouse owned by Compton, was Compton's primary client, accounting for 95% of its delivery business. In making the deliveries, Compton used its own trucks and the drivers and helpers on the trucks were Compton employees. These drivers were represented by the union during this period and operated under collective bargaining agreements negotiated after Compton recognized the union.

In June of 1975 Merchants, which delivered for Penney in other parts of the country, submitted a proposal to Penney in St. Louis, promising better and cheaper service as well as "[n]o unions." According to Merchants, the key to its competitive edge was its consistent practice of engaging only drivers who owned their own equipment to make the deliveries, as opposed to hiring employees to drive company trucks. Penney thereupon warned Compton that its bid would have to be significantly reduced if it were to retain the delivery contract when it came up for renewal and suggested that ADC, an owner-operator delivery company formed by Compton's principals in 1970, submit a bid. ADC accordingly submitted a bid for payment on a per-stop basis, and was notified on July 22, 1975, that its bid had been accepted. Compton's contract was subsequently cancelled.

On July 28, 1975, Billie Hunt, the president of both Compton and ADC, met with his drivers, helpers and other employees to inform them of Compton's loss of the contract. Three days later he again met with the drivers and helpers to tell them that they would have the first opportunity to become owner-operators for ADC. Of the nine owner-operators signed up by ADC,

---

* The Honorable John R. Bartels, Senior United States District Judge, Eastern District of New York, sitting by designation.

1. The Board was denied interlocutory relief in the form of a preliminary injunction. *See Solien v. Merchants Home Delivery Service, Inc.,* 557 F.2d 622 (8th Cir. 1977).

five were ex-Compton employees, and three more ex-Compton employees worked as helpers on ADC's Penney delivery trucks. Compton laid off a total of twenty employees as a result of the loss of its Penney contract, but did not go out of business, since it still had a contract with Penney for warehousing services and performed intermittent delivery service with three trucks which had not been sold or leased to ADC's new contingent of owner-operators.[2] ADC's success in winning the Penney contract was short-lived, however. Evidently as a result of unfair labor practice charges filed by the union against Compton and ADC,[3] Penney negotiated a hasty contract with Merchants in January 1976 and cancelled its agreement with ADC.

Understandably concerned about their future, ADC's Penney drivers contacted an attorney by the name of Terry Peebles, who had earlier assisted them in incorporating and making other arrangements to lease or buy the trucks they used when they signed on with ADC. Peebles called Penney, who referred him to Merchants. Merchants, of course, needed to sign up owner-operators to fulfill its contract with Penney, and was particularly interested in taking on persons familiar with Penney operations. Accordingly Walter Carson, Merchants' operations manager, set up a meeting with the drivers at Peebles' office and discussed Merchants' terms of hiring. He also passed out "applications for employment,"[4] although he stressed that persons selected were not to consider themselves employees of Merchants. Some days later, Carson called the drivers up again and arranged a meeting on January 12, 1976, in Penney's conference room where, after expressing some dissatis-

faction with the rates they would be earning, and after consulting with their attorney Peebles, the drivers signed up with Merchants.

Under the circumstances of this case, it is important to note that only one of the drivers, Lloyd Reid, was doing business as an individual when he signed up with Merchants. Greenwald and Holleran were doing business as G & H Delivery, Inc.; Potts and Glazebrook as G & P Express, Inc.; Flowers and Kleinschmidt as F & K Delivery, Inc.; and Drozd and Hale as H & R Delivery Co., a partnership. Another two-man partnership, Sandau Moving and Storage, was signed up by Merchants one week later to run a shuttle between Penney stores and warehouses. Of these eleven individuals, the first eight or nine, who were doing the actual deliveries, had previously worked for Compton and then for ADC on the Penney account, a fact which made them especially attractive to Merchants. The two partners driving the shuttle had also previously driven for ADC, though not on the Penney account. With this background in mind, we may now focus on the major elements of the relationship between Merchants and its owner-operators which are set forth in the "Independent Truckman's Agreement" and the "Lease with Option to Purchase and Service Agreement" executed by each owner-operator.[5]

### Independent Truckman's Agreement

The Truckman's Agreement refers to the owner-operator as a "contractor," and provides that the parties intend to create an independent contractor relationship and not one of employer-employee.[6] "When re-

---

2. The foregoing background is taken largely from the opinion of the NLRB in Am-Del-Co, Inc., 225 NLRB No. 93, 1975–76 NLRB Dec. [CCH] ¶ 17,050 (1976), of which the Administrative Law Judge in this case took judicial notice.

3. *See id.*

4. This is required of contract carriers who "employ" drivers by 49 C.F.R. §§ 390.32, .33(a), 391.3(c), .21 (1976). The word "employ" is used broadly in the regulations to mean requir-

ing or permitting a person to drive a motor vehicle in furtherance of the business of the motor carrier.

5. Except Lloyd Reid. *See* note 9 and accompanying text, *infra.*

6. Paragraph 1 of the Independent Truckman's Agreement states in full:

*Control and Exclusive Use.* In performing services under this agreement the Contractor will direct the operation of his equipment in all respects and will determine the method,

quested" by Merchants, the owner-operators will deliver and load and unload shipments packaging and padding them as necessary. The owner-operator must provide at his own expense whatever labor is necessary, and such labor is to be under the sole control of the owner-operator, who is responsible for all of his helpers' employment taxes, etc., and is to hold Merchants harmless from liability for any injuries occurring to them. The owner-operator warrants the good condition of his equipment, and is to pay all maintenance, operating and licensing fees. Liability insurance paid for by the owner-operator is arranged through Merchants' fleet plan, and Merchants carries at its own expense cargo insurance in sums required by law. However, the owner-operator is liable for loss of or damage to merchandise in its possession, and Merchants has the exclusive prerogative to settle claims, subject to a reasonable opportunity on the part of the owner-operator to prove lack of fault. He is to collect all C.O.D.'s and remit them to Merchants within twenty-four hours. Under federal regulations, the trucks driven for Merchants must carry the name of the carrier. 49 C.F.R. Part 1058 (1976). The contract requires the owner-operators to remove such identification upon termination of the contract.

Compensation to the owner-operator is fixed by the contract at 60% of all hauling revenue,[7] expressly understood to be entirely dependent on the volume of deliveries ordered by Penney. Merchants disclaimed any guarantee of such volume, and, in the event of a material drop in deliveries, reserved the right to allocate deliveries among the owner-operators or reassign the owner-operators or terminate any owner-operator. The contract was to remain in effect for one year, and then continue from year to year with an option by either party to terminate on thirty days' notice. The contract could also be terminated if the contractor received three notices of substandard service from Merchants. The contract is personal to the owner-operator, and no rights or duties are assignable or delegable thereunder. The contract also requires the owner-operators to post a performance bond, but Merchants gave them a $500 advance to cover initial cash flow problems. This advance was recovered by Merchants through deductions in the checks it sent the owner-operators for services rendered.

*Lease with Option to Purchase and Service Agreement*

Under the lease, the owner-operator leases his truck to Merchants with an option to purchase. No price is set for exercise of this option, and its significance is not apparent. During the term of the lease, which is to last for one year, and be automatically renewed from year to year thereafter, terminable by either party on thirty days' notice, Merchants has "sole, absolute and exclusive use, charge, control and responsibility over the operation and use of the motor vehicle equipment herein leased, without hindrance, advice or interference from or by the said Lessor." This is required by 49 C.F.R. § 1057.4(a)(4) (1976), which permits carriers to perform authorized transportation in equipment they do not own only if the contract, lease or arrangement for use of the equipment provides "for the exclusive possession, control and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee. . . . ." This is also in conflict with the Truckman's Agreement, which states that the owner-operator "will direct the operation of his equipment in all

means and manner of performance including, but not limited to, such matters as choice of any lawful routes, points of service of equipment, rest stops and timing of customer deliveries. The parties intend to create by this agreement the relationship of an independent contractor and not an employer-employee relationship. Neither the Contractor nor any of his employees are to be considered employee [sic] of the Company insofar as the subject matter of this agreement is concerned or in performing services under this agreement.

7. Rates for standard deliveries are $12.50 per stop, plus $.45 per mile beyond a fifty-mile zone. The shuttle drivers are reimbursed at a flat $120 per day per truck.

respects."[8] The parties also agreed that the leased equipment "shall not be utilized by either the Lessor or the Lessee except in the service of Lessee in accordance with appropriate operating authority. . . ." The owner-operator is to perform certain services "on behalf of the Lessee," namely, to keep the truck washed, painted and maintained to the satisfaction of Merchants and its shipper (Penney), to pay all personal property taxes, gasoline, oil, etc., and to keep the truck in good mechanical condition. The owner-operator is to operate the truck as driver, or obtain a qualified substitute driver acceptable to Merchants for the operation of the truck and the performance of the delivery services which Merchants has contracted to perform with its shipper. The owner-operator will pay for all insurance costs Merchants is required by regulation to incur. Merchants also agreed to have the vehicle inspected by persons designated by itself as required by federal and state regulatory authority, and agreed not to sublease the truck. The parties agreed that insofar as its obligations as a regulated shipper are concerned, Merchants would be responsible to the public and its shippers for the operations of the vehicle and the performance of its shipping contracts. The parties further agreed that operations shall be conducted in full conformity with valid federal and state regulations. Consideration for the lease was the same as for the contract—60% of the revenues accruing from operation of the leased equipment.

The record indicates that two trucks were leased to Merchants by Sandau, the partnership handling the shuttle; two by G & H Delivery, Inc.; one each by H & R Delivery, F & K Delivery and G & P Express; and none by Lloyd Reid, the individual.[9] It should be noted that Merchants provides no benefits, such as health insurance or vacation to the owner-operators, and makes no deductions for employment taxes from its payments to the owners-operators.

*Merchants-Penney Contract*

Merchants' contract with Penney, referred to in the lease, provides further background on Merchants' relations with its deliverymen. The owner-operators knew of the contract between Penney and Merchants, although there is no evidence they knew the precise terms thereof. According to the contract, Merchants will deliver to Penney's customers such merchandise as Penney desires, uncrated and placed in the customers' homes with all containers and wrappings removed and all debris cleaned up. Deliveries are to be made according to and be recorded on a delivery manifest. Merchants is also to pick up merchandise to be returned to Penney. C.O.D. funds will be collected, and all such funds "collected by [Merchants], its employees or agents" are to be held in trust for Penney. If a customer is not home, a nondelivery card is to be left and a second delivery is to be attempted free of charge while the truck is in the same general area; Penney is to be notified if the second attempt is unsuccessful.[10] Refused merchandise is to be returned free of charge. Penney reserved the right to contact customers directly to verify proper performance, and Merchants agreed that it would not use any employee objected to by Penney for deliveries. Merchants assumed liability for loss of or damage to merchandise in its possession, and agreed to maintain auto and general liability insurance. Delivery zones and payment schedules were agreed upon, with respect to standard deliveries, pickups and returns, difficult deliveries, special deliveries and time deliveries.

---

8. See note 6, *supra*.

9. In the Independent Truckman's Agreement, Reid stated that he was the owner of the vehicle described therein. However, according to the testimony, Reid was buying a truck from G & H Delivery at the rate of $25 per working day. Title in the truck, which was not one of those leased by G & H to Merchants, remained with G & H. The Board has treated these owner-operators as a group, and not drawn distinctions between the individuals involved. We therefore do not stress the unique situation of Lloyd Reid.

10. According to the testimony, the driver notifies Penney directly.

Merchants agreed to place all merchandise in designated loading areas according to route, to route all deliveries according to the most practicable schedule, to prepare manifests in delivery sequence, and to arrange to provide a reasonably uniform number of deliveries daily. All merchandise is to be inspected, properly protected (blanket wrapped, etc.), and loaded by Merchants. Merchants is to exercise all reasonable care in loading, delivery and setting up the merchandise, to assume responsibility for loaded merchandise, and to pay at cost for repairs or replacements. The delivery trucks were to be kept clean and in good condition, and to display appropriate signs provided by Penney. The drivers and helpers are to wear uniforms as desired by Penney (although the record does not show that such was done) and Merchants is to be at all times courteous and cooperative with Penney's customers, making every effort to leave them pleased with their relationship with Penney.

The record contains a certain amount of information as to the practices of the deliverymen. One of the drivers testified that they have become quite familiar over the years with the way Penney likes its deliveries to be done, and Merchants' president testified that Merchants has no particular procedures to be followed, other than the exercise of good judgment. The delivery process begins when Penney hands over delivery slips to Merchants' regional manager or account manager, who groups the slips according to zip code into as compact a route as possible. Merchants' manager distributes the groups to the owner-operators when they come in between 7:30 and 8:30 o'clock in the morning to pick up that day's load. The owner-operators take the slips home and "fine route" them in the evening for the next day, while Merchants has the corresponding merchandise staged in the appropriate loading area. Merchants' manager also oversees to some extent the loading process and checks to see that the trucks are in satisfactory condition. If a driver is unable to make it to the warehouse to begin deliveries, he will contact Merchants' manager there, who will try to get another driver or helper to make the delivery. Merchants' president testified that the owner-operators could refuse to take a load, but there is no evidence that this was done. Merchants' manager has on occasion requested a driver to make an extra run.

It appears that those owner-operators who have only one truck work almost exclusively for Merchants, using either their partner or a hired helper to assist them. G & H Delivery has three trucks, one of which is used fairly steadily by Lloyd Reid on the Merchants run, and one of which was operated fairly constantly for Merchants by one of the partners. Despite the provision in the lease that the trucks were to be used exclusively in Merchants' service G & H used one of the trucks to make deliveries for another furniture store under the auspices of ADC for about three weeks. Merchants' manager expressed no objection to this, as long as their work for Merchants was accomplished. In general, this third truck is used on Merchants' business about one-third of the time, and sits idle the rest of the time. When Greenwald and Holleran are both out driving, they hire their own assistants without Merchants' approval, and pay them on a per-stop basis, after deductions for taxes.

Sandau, which runs the shuttle for Merchants, has a total of eight employees and handles warehousing and deliveries for one store other than Penney, and delivers for a third store under the auspices of ADC. At the time of the hearing, it owned two trucks and was planning to buy a third, and also leased two trucks from Compton leasing. On one occasion Sandau used one of the trucks leased to Merchants for some non-Merchants business. Kombol usually handles the Merchants shuttle, and Fritz rotates between the other two stores. Kombol on occasion has hired a helper to take the Merchants shuttle.

### Discussion

In distinguishing between employees and independent contractors, the Board and the courts apply general agency principles, *NLRB v. United Ins. Co. of America,* 390

U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), such as those found in Restatement (Second) of Agency § 220 (1957).[11] *Associated Gen'l Contractors of Calif., Inc. v. NLRB,* 564 F.2d 271 (9th Cir. 1977); *Associated Independent Owner-Operators, Inc. v. NLRB,* 407 F.2d 1383 (9th Cir. 1969). "Of the considerations employed in reaching a decision under general agency law, the determination of who has the right to control and direct the work is foremost . . . tempered, however, by other considerations relevant to the relationship in its entirety." *Associated Gen'l Contractors,* 564 F.2d at 279. The element of control "rests primarily upon the amount of supervision that the putative employer has a right to exercise over the individual, particularly regarding the details of the work." *Associated Independent Owner-Operators,* 407 F.2d at 1385. The question is often phrased in terms of whether the supposed employer has the right to control not only the result, but also the manner and means by which the desired result is to be obtained. *Associated Gen'l Contractors, supra; NLRB v. Steinberg,* 182 F.2d 850 (5th Cir. 1950). In cases of this nature, where there appears to be little occasion for the assertion of control over deliverymen on their own most of the day, it is helpful to focus on the "important distinction . . . between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results." Restatement (Second) of Agency § 220, comment e (1957). Other factors which this court has considered are the entrepreneurial aspects of the individual's business; risk of loss and opportunity for profit; and the individual's proprietary interest in his business. *Brown v. NLRB,* 462 F.2d 699 (9th Cir.), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972).

It is the rare case where the various factors will point with unanimity in one direction or the other. Although the Board has no particular expertise in applying the common law of agency to the facts of this case which the court does not also possess, the court should not set aside the Board's determination of the issue merely because the court, as an original matter, would have decided the case the other way. If the Board's conclusion represents a "choice between two fairly conflicting views," it may not be displaced. *NLRB v. United Ins. Co. of America,* 390 U.S. at 260, 88 S.Ct. at 991. On the other hand, the Board cannot be upheld "where it has in its 'application of the law to the facts overlooked accepted principles of the law of agency . . ..' " *SIDA of Hawaii v. NLRB,* 512 F.2d 354, 357 (9th Cir. 1975), quoting *Brown v. NLRB,* 462 F.2d at 702, and *Carnation Co. v. NLRB,* 429 F.2d 1130, 1134 (9th Cir. 1970). "There are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contrac-

11. Restatement (Second) of Agency § 220 (1957) reads as follows:

Definition of Servant

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

tor," *NLRB v. United Ins. Co. of America,* 390 U.S. at 258, 88 S.Ct. at 990 and this case is no exception. Each case must be decided on its own facts, and a person can be an employee for one purpose and an independent contractor for another. *Carnation Co. v. NLRB, supra.* We are thus brought to a consideration of the salient facts of the case in the light of the above principles.

■ There is some evidence in the record indicating control by Merchants over some of the details of the deliveries. For instance, deliveries must be made in washed, painted, distinctively identified and well-maintained vehicles by courteous, cooperative, and possibly uniformed personnel, and Merchants is able to enforce compliance by notices of substandard performance. In addition, Merchants has the right to approve substitute drivers in order to insure that they are able to perform the service required under Merchants' contract with Penney. The Administrative Law Judge relied heavily on Merchants' right to send notices of substandard performance in his determination that Merchants has the right to exercise daily control and supervision over the deliverymen. We do not agree, for there is a difference between directing the means and manner of performance of work and exercising an ex post facto right to reprimand when the end result is unsatisfactory. *Cf. Associated Gen'l Contractors, supra* (reprimands to dump truck drivers); *SIDA of Hawaii, supra* (taxi drivers to be neat and courteous).

Other elements relied on by the Board to show control by Merchants over the owner-operators' manner of delivery also relate to control of the result, not control of the means. For instance, Merchants must divide up the deliveries among its owner-operators, and the fact that it does so according to geographical area and in order to provide a reasonably uniform number of deliveries per delivery day relates to what it wants a particular owner-operator to do, not how it is to be done. Indeed, the fine routing is left to the owner-operators. *Cf. Associated Gen'l Contractors, supra* (dump truck drivers paid by the ton/mile told what route to take were independent contractors). Merchants' right to allocate work if there should be a material decline in delivery volume is likewise a control over the result and not over the means.

■ The exclusive control which the lease purports to grant Merchants over the leased trucks does undercut the independence of the owner-operators, however. Lease provisions such as this which are required by federal regulations may be considered in conjunction with other elements of the relationship in determining the status of an individual worker. *NLRB v. Deaton, Inc.,* 502 F.2d 1221 (5th Cir. 1974), *cert. denied,* 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975); *Ace Doran Hauling & Rigging Co. v. NLRB,* 462 F.2d 190 (6th Cir. 1972); *Steel City Transport, Inc. v. NLRB,* 389 F.2d 735 (3d Cir. 1968). Such provisions, however, do not necessarily imply the existence of an employment relationship, *SIDA of Hawaii v. NLRB, supra,* and in this case, the Truckman's Agreement guaranteed to the owner-operators the right to control the "method, means and manner of performance" of the deliveries. While this latter provision may have been intended by Merchants to guarantee its claim of "[n]o unions," as the Administrative Law Judge found, it is still a relevant part of the contract defining the relationship between the parties, and it appears to reflect the reality of how the deliveries are actually made. In addition, although the owner-operators were required to make deliveries "[w]hen requested," including extra deliveries, the owner-operators did not surrender their time and physical activities to Merchants. They arrived in the early morning at times of their choosing, did their own fine routing, and worked only as long as necessary to make the deliveries, quitting sometimes in the early afternoon, sometimes in the evening.

■ While a balancing of the various indicia of control is somewhat inconclusive, the entrepreneurial characteristics of the owner-operators tip decidedly in favor of independent contractor status. All but one of the owner-operators are doing business

as corporations or partnerships; two own more than one truck, and sometimes engage in non-Merchants business; all have the right to employ their own helpers to assist them in making deliveries, and several do so, paying the relevant employment taxes themselves; and all have a substantial investment in their equipment, which is their responsibility to fuel, maintain, insure and generally keep up to Merchants' standards—and their own standards. The owner-operators thus retain the attributes and responsibilities of ownership over their trucks in spite of the fact that the trucks are leased to Merchants. It is also of significance that these deliverymen owned their trucks prior to signing with Merchants, and that it is Merchants' standard practice not to own any delivery trucks.

In further support of independent contractor status, it is to be noted that the owner-operators supply all of the other equipment and tools necessary for making the deliveries, such as padding, and that Merchants does not have its own place of business in the area. In addition, the delivery of home furnishings has been recognized to be a skilled occupation. *See* 49 C.F.R. § 1040.2(b) note (1976), and the parties stated that they were creating an independent contractor relationship. Payment is also by the job and mileage, not by the

hour, and there is no guarantee as to amount, and the owner-operators are not on Merchants' payroll. Also, the risk of loss is placed squarely on the shoulders of the owner-operators, who must indemnify Merchants for lost or damaged merchandise, and who will suffer more from a loss of business than Merchants, which has no capital invested in its business.

In reaching our conclusion, we have not ignored the factors militating against independent contractor status, such as the limited opportunity to increase profits from the Penney run, the fact that the owner-operators are engaged in the same line of business as Merchants, are engaged for an indefinite period of time except for the first full year, sell no merchandise and have no proprietary interest in their routes. *Cf. Carnation Co., supra.*

In balancing these admittedly conflicting factors we believe our decision must be controlled by the Supreme Court's holding in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), where the Court decided that certain truckmen working for Greyvan Lines were independent contractors and not employees for Social Security purposes. The relevant facts, which we have set out in full in the margin,[12] closely resemble the facts before us

---

12. The respondent operates its trucking business under a permit issued by the Interstate Commerce Commission under the "grandfather clause" of the Motor Carrier Act. [49 U.S.C.A. § 301 et seq.] 32 M.C.C. 719, 723. It operates throughout thirty-eight states and parts of Canada, carrying largely household furniture. While its principal office is in Chicago, it maintains agencies to solicit business in many of the larger cities of the areas it serves, from which it contracts to move goods. As early as 1930, before the passage of the Social Security Act, the respondent adopted the system of relations with the truckmen here concerned, which gives rise to the present issue. The system was based on contracts with the truckmen under which the truckmen were required to haul exclusively for the respondent and to furnish their own trucks and all equipment and labor necessary to pick up, handle and deliver shipments, to pay all expenses of operation, to furnish all fire, theft, and collision insurance which the respondent might specify, to pay for all loss or damage to shipments and to indemnify the

company for any loss caused it by the acts of the truckmen, their servants and employees, to paint the designation "Greyvan Lines" on their trucks, to collect all money due the company from shippers or consignees, and to turn in such moneys at the office to which they report after delivering a shipment, to post bonds with the company in the amount of $1,000 and cash deposits of $250 pending final settlement of accounts, to personally drive their trucks at all times or be present on the truck when a competent relief driver was driving (except in emergencies, when a substitute might be employed with the approval of the company), and to follow all rules, regulations, and instructions of the company. All contracts or bills of lading for the shipment of goods were to be between the respondent and the shipper. The company's instructions covered directions to the truckmen as to where and when to load freight. If freight was tendered the truckmen, they were under obligation to notify the company so that it could complete the con-

and present an even stronger case than here for the finding of an employment relationship. For instance, the drivers there were required to haul exclusively for their carrier, follow all of its rules and regulations, and report their positions to the carrier's dispatcher at various intervals. Nevertheless, the Supreme Court held that

> where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. . . . It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.

331 U.S. at 719, 67 S.Ct. at 1471 (footnote omitted). In *Silk*, the Supreme Court concluded that in the context of labor relations " 'employees' included workers who were such as a matter of economic reality." 331 U.S. at 713, 67 S.Ct. at 1468. This liberal test was subsequently discarded by Congress when it amended the Social Security Act and the NLRA to restrict the determination of employee status to the traditional common law standards. However, in view of its consideration of the economic reality test, the Court's determination that the Greyvan drivers were independent contractors assumes greater significance for our purposes. *See NLRB v. United Ins. Co. of America, supra; United States v. W. M.* *Webb, Inc.,* 397 U.S. 179, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970).

The Seventh Circuit has relied on *Silk* to set aside a Board decision on facts almost identical to *Silk. National Van Lines, Inc. v. NLRB,* 273 F.2d 402 (7th Cir. 1960). In *NLRB v. Deaton, Inc., supra,* and *Steel City Transport, Inc. v. NLRB, supra,* decided on facts similar to those presently before us, *Silk* and *National Van Lines* were distinguished, primarily on the ground that they did not involve a lease of trucks to the carrier.[13] We do not find this distinction persuasive, however, for in *Silk,* the Greyvan drivers contracted to work exclusively for Greyvan, which, in our opinion, is a more significant infringement on an owner-operator's independence than the lease and Truckman's Agreement here involved.

Accordingly, we do not believe we are displacing a choice between two fairly conflicting views in the present case when upon consideration of the totality of the facts and circumstances in the light of *United States v. Silk,* we conclude, as we do, that the owner-operators were independent contractors. Therefore the petition for review is granted, and the petition for enforcement is denied.

tract for shipment in its own name. As remuneration, the truckmen were to receive from the company a percentage of the tariff charged by the company varying between 50 and 52% and a bonus up to 3% for satisfactory performance of the service. The contract was terminable at any time by either party. These truckmen were required to take a short course of instruction in the company's methods of doing business before carrying out their contractual obligations to haul. The company maintained a staff of dispatchers who issued orders for the truckmen's movements, although not the routes to be used, and to which the truckmen, at intervals, reported their positions. Cargo insurance was carried by the company. All per-

mits, certificates and franchises "necessary to the operation of the vehicle in the service of the Company as a motor carrier under any Federal or State Law" were to be obtained at the company's expense.

*United States v. Silk,* 331 U.S. 704, 708–09, 67 S.Ct. 1463, 1465, 91 L.Ed. 1757 (1947).

13. *See also Dovell v. Arundel Supply Corp.,* 124 U.S.App.D.C. 89, 361 F.2d 543 *cert. denied,* 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966), a tort case where the majority recognized that *Silk* was closely in point, but distinguished it on the grounds that *Silk* was a Social Security case, and that it was not clear that, had a jury decided the other way in *Silk,* the Supreme Court would have set the verdict aside.