**CONSTRUCTION, BUILDING MATERIAL, ICE & COAL DRIVERS, HELPERS AND INSIDE EMPLOYEES UNION, LOCAL NO. 221, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Associated General Contractors of Minnesota, Intervenor.**

**NATIONAL LABOR RELATIONS BOARD, Petitioners,**

v.

**ASSOCIATED GENERAL CONTRACTORS OF MINNESOTA, Respondent,**

**Construction, Building Material, Ice & Coal Drivers, Helpers and Inside Employees Union, Local No. 221, et al., Park Construction Company, Intervenors.**

Nos. 88–1629, 88–1722.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1990.
Decided March 30, 1990.

 

Petition for Review and Cross–Application for Enforcement of an Order of the National Labor Relations Board.

Application for Enforcement of an Order of the National Labor Relations Board.

Stephen D. Gordon, Minneapolis, Minn., for petitioners.

Fred L. Cornnell, Jr., Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., was on the brief, for respondent. William R. Stewart, Atty., N.L.R.B., Washington, D.C., also entered an appearance, for respondent.

A. Patrick Leighton, St. Paul, Minn., was on the brief, for intervenor.

Before RUTH BADER GINSBURG, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case concerns the National Labor Relation Board's (NLRB or Board) classification of certain truck owner-drivers as "independent contractors," not "employees," within the meaning of section 2(3) of the National Labor Relations Act (Act), 29 U.S.C. § 152(3) (defining "employee" to "include any employee" but to exclude "any individual having the status of an independent contractor"). The controversy stems from a dispute between the Construction, Building Material, Ice and Coal Drivers, Helpers and Inside Employees Union, Local No. 221 (Union)—Minnesota's union of highway and heavy construction truck drivers—and construction contractor employers over the Union's attempt to organize and regulate the hiring of Independent Truck Operators (ITOs). Truck drivers in the construction industry haul materials to and from construction jobsites. Many are conventional drivers who work for only one employer and drive trucks owned by that employer. ITOs, in contrast, own their own vehicles and either

drive the trucks themselves or hire others to drive them.

Associated General Contractors of Minnesota (AGC), an association of construction employers, and Park Construction Company (Park), an individual employer, filed unfair labor charges against the Union based on its efforts to organize and restrict the hiring of ITOs. The NLRB held that ITOs are independent contractors and that the Union, in failing to so recognize, had committed unfair labor practices. The Union petitioned for review, and the Board applied for enforcement. Finding no cause to disturb the NLRB's adjudication, we deny the petition and enforce the Board's order.

## I. CONTOURS OF THE CONTROVERSY

The NLRB's opinion whether construction truck drivers are employees or independent contractors has altered over time. In 1971, in *J.K. Barker*, a divided panel of this court affirmed an NLRB determination that Southern California construction dump truck drivers who owned their own vehicles were employees of construction contractors. *See Joint Council of Teamsters No. 42 v. NLRB*, 450 F.2d 1322 (D.C.Cir.1971) (*Barker*). Six years later, however, the Ninth Circuit reversed a similar determination by the Board and expressed agreement with the dissent in this court's *Barker* decision. *See Associated General Contractors (AGC) v. NLRB*, 564 F.2d 271, 281–82 (9th Cir.1977). The Board acquiesced in the Ninth Circuit's decision but only as the law of that particular case. Thereafter, in a 1980 decision affirmed by this court the next year, the Board relied on the Ninth Circuit's analysis in *AGC* to conclude that dump truck drivers were independent contractors rather than employees of the brokers through which they made their financial arrangements with the construction

contractors. *See Building Material & Dump Truck Drivers, Teamsters Local Union No. 36*, 249 N.L.R.B. 386 (1980), *enforced*, 669 F.2d 759 (D.C.Cir.1981), *aff'd*, 459 U.S. 344, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983) (*Shepard*).

Meanwhile, the Division of Advice in the Board's Office of General Counsel was making its own pronouncements concerning the status of independent truck drivers in the particular context of this dispute. In November 1979, the Division of Advice recommended dismissal of unfair labor practice charges filed against the Union for its attempts to unionize ITOs. The Division of Advice reasoned that the charges were groundless because ITOs were employees, not independent contractors.[1]

Relying on the Division of Advice's determination, the Union, in April 1980, reached a Memorandum of Understanding with AGC. The Memorandum included ITOs in a union security provision requiring workers to join the Union shortly after employment and a referral provision mandating that employers in search of trucks go first to the Union hiring hall before turning to brokers or individual ITOs.[2] In July 1980, an association of ITOs filed charges against the Union for attempting to coerce ITOs to join. In assessing these charges, the Division of Advice reversed its previous position and, on March 23, 1981, concluded that ITOs were independent contractors. The Union, once it received this determination, informed the Board that it would no longer enforce the April 1980 Memorandum.

Shortly before the Division of Advice March 23, 1981 pronouncement, however, the Union had sought to enforce the April 1980 Memorandum against Park; specifically, the Union alleged that Park had violated the Understanding by subcontracting

1. This recommendation was affirmed by the Board's Office of Appeals in March 1980, and no complaint was filed.

2. The referral clause provided:
The employer agrees to give the Union equal opportunity to refer trucks driven either by ITOs or drivers of multi-truck owners to be used by the employer. To implement this provision, the employer shall call the Union and advise it of the number and type of trucks needed, the work involved, and the time and place where needed. If the Union is unable to provide the requested number of trucks, the employer is then free to obtain such trucks from any other source.

to non-Union ITOs without first requesting drivers from the Union. Park did not respond and, on March 28, 1981, the Union renewed its grievance. This time, however, the Union did not rely on the Memorandum; instead, the Union invoked Article XI of the collective bargaining agreement, which provided that

> in the event a subcontract is involved in a controversy, the Union shall be obligated to bring it to the attention of the prime contractor. The prime contractor shall have at least forty-eight hours to attempt a settlement of the controversy. It shall not be a violation of this agreement, including Article XII (the No–Strike, No–Lockout provision), if a stoppage of work occurs due to the failure to arrive at an agreement.

Park agreed to meet with the Union on April 1, 1981, but the parties reached no agreement on subcontracting to non-Union ITOs. On April 2, the Union struck Park. In negotiations to end the picketing, Park agreed not to subcontract to non-Union ITOs for the remainder of the existing collective bargaining agreement. Park and AGC subsequently filed unfair labor charges against the Union, and the Board issued a complaint.

After a hearing, an Administrative Law Judge (ALJ), on June 18, 1982, held that ITOs are independent contractors, not employees. Joint Appendix (J.A.) at 16. The ALJ traced Board precedent from *Barker* through *Shepard, see supra* p. 1240, and then detailed the relationships between drivers and construction employers that led him to type ITOs as independent contractors. J.A. at 17–21.

The ALJ next held that because ITOs are not employees, the union security clause and referral provisions of the April 1980 Memorandum of Understanding, and the Union's effort to secure them, constituted unlawful secondary activities. J.A. at 21–24. The ALJ also found unlawful the

threat to strike and the actual strike against Park. He further found violative of the Act the Union's demand, in exchange for its agreement to cease picketing, that Park promise not to subcontract to ITOs for the remainder of the existing collective bargaining agreement. J.A. at 27–29.

The ALJ ordered the Union to cease and desist from these violations and to post notices, but did not order a reimbursement remedy. J.A. at 32–33. The Board affirmed the ALJ's decision. *See* 290 N.L.R.B. No. 66 (July 29, 1988).

## II. EMPLOYMENT STATUS OF ITOS

■ The pivotal question presented by the Union's petition for review, as we said at the outset, is whether ITOs are employees of the construction contractors for whom they work or independent contractors. Courts generally respect reasoned NLRB determinations of this order, recognizing the Board's primary authority to choose " 'between two fairly conflicting views.' " *See NLRB v. United Ins. Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). We have tempered our deference in this case, mindful that the Board is endeavoring to apply agency law principles and that its position has changed or evolved over time. *Cf. Local 777, Democratic Org. Comm., Seafarers Int'l Union v. NLRB,* 603 F.2d 862, 872 (D.C.Cir.1978) (finding "any great amount of deference" "inappropriate" "because of the Board's history of vacillation").[3] Upon inspection of the ALJ's thorough analysis of the working relationships between truck drivers and construction contractors, however, we are satisfied that the NLRB's decision classifying ITOs as independent contractors merits our approbation. We state below our reasons for accepting the Board's judgment.

---

**3.** The Division of Advice, it appears from the history of this case, *see supra* p. 1240, has not moved in lock step with the Board. The apparent coordination or communication lapse may bear Board attention, but Division positions are prosecutorial, not adjudicative, in character: they are not attributable to the Board, and they are not reviewable in court. *See NLRB v. United Food and Commercial Workers Union, Local 23,* 484 U.S. 112, 130, 108 S.Ct. 413, 431, 98 L.Ed.2d 429 (1987).

Before the ALJ and again in this court, the Union featured *Barker* as its lead case. We appreciate that the facts in that case, in *AGC*, and in this one are scarcely distinguishable for the purpose at hand. To recapitulate what we have already indicated on that score, the Board has turned away from *Barker*. *See supra* p. 1240. Furthermore, our own *Barker* opinion imposed no outcome on the Board; that opinion ultimately rested on the NLRB's prerogative to choose "between two fairly conflicting views." *See Barker*, 450 F.2d at 1329.

The right to control the "means and manner" of job performance, the Union and the Board agree, is the *leitmotiv* recurrent in the cases in point. *See, e.g., North Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599–600 (D.C.Cir.1989) (holding that over-the-highway drivers are independent contractors, not employees of moving company that hires them). The Union maintains, however, that in evaluating whether a putative employer controls the "means and manner" of job performance, the Board and reviewing courts must home in on the extent of job-site supervision. The ALJ refused to focus the inquiry primarily on the truckers' jobsite activity. Instead, he reviewed all of the circumstances of the employment relationship, treating no one factor as decisive.

The wider inspection made by the ALJ, and approved by the Board, reflects the current jurisprudence and is consistent with longstanding Supreme Court guidance. *See United Ins. Co.*, 390 U.S. at 258, 88 S.Ct. at 990 ("[A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive."). It is true that the NLRB heavily emphasized on-the-job supervision in *Barker*. But the Ninth Circuit said in *AGC* that such supervision is not necessarily dispositive of control of the means and manner of job performance. The Board has by now harmonized its position with that of the Ninth Circuit, and we find this accord entirely rational.

In this case, just as in *AGC*, the ALJ observed, "[a]t the jobsite and during the actual hauling operation, ITOs must follow the same regimen as a company driver"; but "these similarities," he commented, "are necessitated by the facts and circumstances of the job, not because of the relationship which has been established between the ITOs and the contractors." *See* J.A. at 21. Because both company employees and ITOs work at the same site, efficiency requires that they follow essentially the same procedures. Moreover, many company safety rules, *e.g.*, required use of back-up bells, are mandated by government regulations. *See North Am. Van Lines*, 869 F.2d at 599 (explaining that "restrictions upon a worker's manner and means of performance that spring from government regulation (rather than company initiatives) do not necessarily support a conclusion of employment status").

The ALJ reasonably determined that most circumstances other than jobsite routines point to ITO status as independent contractors. ITOs own their own trucks and bear the entire entrepreneurial risk incident to ownership. ITOs can obtain jobs either through broker intermediaries or through direct contact with contractors. Although ITOs are paid an hourly rate like regular employees, they do not receive time-and-a-half for Saturday work. The hourly rate for ITOs is generally set by the brokers, but ITOs sometimes negotiate a higher or lower rate directly with contractors.[4] ITOs periodically bill the brokers, who collect from the contractors. Unlike company drivers, ITOs do not receive regular checks with deductions for taxes and social security; and they do not accrue seniority. ITOs can control their work life, as company drivers cannot, in these key respects: ITOs work for several contractors a season; they work on a day to day basis; if they want to take a vacation, they simply do not seek work for that day. In the same mode, ITOs can reject jobs offered or abandon jobs commenced—even in

---

**4.** The Union disputes this finding, but the record adequately supports it. *See* J.A. at 294– 98, 377–80, 630–31.

the middle of the day—without incurring the same discipline a regular employee would receive.[5]

The Union points to some differences between this case and *AGC* but identifies no significant deviations. The Union asserts first that employers require ITOs to carry certain amounts of liability insurance, while there was no evidence of a similar requirement in *AGC*. However, the Ninth Circuit relied expressly on the independent drivers' practice of paying for their own insurance, *see AGC*, 564 F.2d at 280, and ITOs also follow this practice. Another asserted difference is that ITO contracts are oral, not written. Contrary to the Union's claim, however, *AGC* did not turn on the form of the contracts. The Union also argues that when ITOs need special permits, the contractors often obtain them, while in *AGC*, the drivers obtained permits themselves. The permits in *AGC*, however, unlike those in this case, were universally required for licensing, *see id.* at 280; moreover, several Minnesota employers testified that they did not obtain permits for ITOs. *See* J.A. at 184, 488, 533–34. Finally, the Union claims that ITOs' receipt of specific instructions on routes and truck operation distinguishes this case from *AGC*. The record shows, however, that ITOs do not necessarily follow route or operation instructions. *See* J.A. at 374–75, 633. Furthermore, the drivers in *AGC* received similar instructions. *See AGC*, 564 F.2d at 280–81.

In sum, we see this case as one in which the Board has confirmed as its own the course charted by the Ninth Circuit in *AGC*. Our 1971 *Barker* decision surely was not intended to preclude such an evolution, and we now announce our affirmation of it.

## III. NEGOTIATION AND CONSUMMATION OF THE MEMORANDUM OF UNDERSTANDING

■ Because we accept the NLRB's determination that ITOs are independent contractors, we enforce its related decision that the union security and referral provisions of the April 1980 Memorandum of Understanding and the Union's efforts to obtain those provisions were unlawful secondary activities. We recognize that the Union undertook these activities in view of the Division of Advice's November 1979 pronouncement that ITOs were employees. The Union does not press an argument that this pronouncement formally "estops" the Board from giving retroactive effect to its determination. The Union does, however, urge that it should be protected because it reasonably believed, based on the November 1979 advice, that ITOs were employees. But the Division is not a rule dispensing authority and protective shields for unions or employers are not in its arsenal. The Union here thus acted at its peril.[6]

■ Conduct is "primary" and lawful if a union is addressing "the labor relations of the contracting employer vis-à-vis his own employees," but activity is "secondary" and unlawful if it is "tactically calculated to satisfy union objectives elsewhere." *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45, 87 S.Ct. 1250, 1268–69, 18 L.Ed.2d 357 (1967). The ALJ held that the union security and referral provisions of the April 1980 Memorandum, as well as the efforts to obtain those provisions, were secondary because the provisions treated independent contractors as employees and attempted to secure work for unionized ITOs in preference to non-union ITOs.[7] We cannot gainsay that disposi-

5. The Union also contests this finding, but the Union's objections are defeated by the record; indeed, the Union itself acknowledges that "there was testimony to the effect that ITOs have the ability to refuse loads." *See* Petitioner's Brief at 27; *see also* J.A. at 225–26, 254–56, 258–60, 282–83, 370–71, 395–97, 443–44, 468–69, 491–92, 570–72, 576–77.

6. Although the decision to prosecute may have been a harsh exercise of discretion, that decision is not subject to challenge in court. *See*

*supra* note 3. We note that this aspect of the Board's decision has modest, if any, practical consequences because the NLRB did not impose a reimbursement remedy.

7. The Union argues that the ALJ incorrectly found that the referral clause gave the Union a preference. However, the ALJ appropriately rested this finding on the language of the clause, which plainly does provide a preference. *See supra* note 2.

tion. *See, e.g., Shepard,* 669 F.2d at 765. Because ITOs are not employees, the Union's objective was impermissible under *National Woodwork*—regardless of whether the Union in fact believed that the ITOs were employees.

IV. THE STRIKE AGAINST PARK AND THE SUBSEQUENT AGREEMENT

■ The Union's threat to strike against Park, the actual strike, and the agreement that Park would not subcontract for the remainder of the existing collective bargaining agreement were also impermissible, as the Board determined. The lawfulness of the activities against Park turns on whether the Union sought to enforce the provisions of the existing collective bargaining agreement or to amend that agreement. The ALJ reasonably concluded that the Union was trying to alter the existing agreement and thus acted unlawfully.

The Union claims that the Board's decision is fatally flawed because the ALJ erroneously found inconsistent the testimony of two Union officials, Van Lith and Bailey, regarding the purpose of the strike. As reported by the ALJ, Van Lith testified that the Union was seeking to enforce an existing agreement, while Bailey acknowledged that the Union was seeking to add a no-subcontracting clause. According to the Union, both officials testified that the purpose of the strike was to enforce the existing agreement. Both the ALJ and the Union are correct. Bailey's testimony was self-contradictory: sometimes he acknowledged that the Union sought to change the contract; other times he maintained the Union was only enforcing the existing agreement. *Compare* J.A. at 591–92, 851, 880 (agreeing that Union was striking "to obtain" "a new clause") *with id.* at 601–02, 852, 881 (suggesting that Union sought not to renegotiate but "to enforce the collective bargaining agreement" "then in existence"). The ALJ did not err in terming Bailey's testimony inconsistent with Van Lith's unequivocal statement that the Union struck to enforce the existing agreement.

Finally, the ALJ correctly determined that no provision of the existing contract barred subcontracting. He found that the Union's reliance on Article XI was "a pretext designed to provide the Union with a colorable excuse for striking Park in the face of a no-strike clause in its contract." J.A. at 28. This finding was supported by the evidence: Bailey's equivocal testimony; the Union's failure to raise Article XI until Advice's switch in position stripped the Memorandum of Understanding of utility; the language of Article XI, which suggests the clause does not ban subcontracting but merely spells out appropriate procedures should a labor controversy involve a subcontractor; and the inclusion of a clause similar to Article XI in the new collective bargaining agreement even though the employers had rejected a proposed subcontracting ban. *See* J.A. at 14 n. 14.

For the reasons stated, we deny the petition for review and enforce the Board's order.

*It is so ordered.*