CITY CAB COMPANY OF ORLANDO, INC., et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 79–1544.

United States Court of Appeals, District of Columbia Circuit.

Argued May 6, 1980.

Decided July 30, 1980.

Rehearing Denied Sept. 9, 1980.

Harrison C. Thompson, Jr., Tampa, Fla., with whom Robert E. Haythorne, Chicago, Ill., and Thomas M. Gonzalez, Tampa, Fla., were on the brief, for petitioners. A. Byrne Litschgi, Tampa, Fla., also entered an appearance for petitioners.

Richard A. Cohen, Atty., N.L.R.B. of the bar of the Supreme Court of New York pro hac vice by special leave of Court, Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., was on the brief, for respondent.

Before McGOWAN and ROBINSON, Circuit Judges, and OBERDORFER *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

The National Labor Relations Board (the Board) has ordered petitioner City Cab Co. of Orlando, Florida, to bargain collectively with its taxi drivers.[1] The company seeks

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Petitioners are the City Cab Co. of Orlando, Inc., and its affiliated entity Yellow Cab Co. of Orlando, Inc., d/b/a Yellow Cab Co. and Dixie

Cab Co. The Board on September 19, 1977, established the bargaining unit and directed an election. Drivers voted 91–37 to be represented by the "Yellow, City, Dixie Independent Cab Drivers Association." The company refused to bargain with the Association. The Board found

review of that order, contending that the drivers are not employees, but independent contractors, and therefore not covered by the National Labor Relations Act.[2] Petitioner does not attack the Board's factual findings.[3] Instead, the company asserts that this case is indistinguishable from this court's recent decision in *Local 777, Seafarers International Union v. NLRB*,[4] which found certain taxi drivers to be independent contractors. The Board, however, identified several factual differences between this case and *Local 777*, and concluded that petitioner's drivers were employees within the meaning of the Act.

Cases of this sort often turn on fine factual distinctions; as the Supreme Court has said, "[T]here is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be weighed with no one factor being decisive." *NLRB v. United Insurance Co.*, 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). The Board in this case did weigh the relevant factors, and it found them indicative of employee status. We cannot say the Board erred in this determination, so we affirm.

I

The facts of this case are set forth here as found by the Board. *See* note 3 *supra*. Petitioner is a taxicab company serving Orlando and vicinity, including the Disney World amusement park and, under an exclusive contract, the Orlando airport. City licenses and permits allow the company to operate 115 of the 127 cabs authorized for the city.

The company drivers formerly worked on commission, retaining approximately 50% of all fares collected, and turning over the remainder to the company. On July 16, 1976, with the goal of making its drivers "independent contractors," the company put into effect a different system. Under the new system, all drivers leased cabs from the company under a schedule of rates incorporated into a contract signed by each driver.

The company changed the rate schedule five times between July 16, 1976, and October 1, 1976. On the latter date, the company presented an entirely new contract to the drivers. This second contract was styled as a "sale of services" by the company to the driver rather than a cab lease. Under the second contract, the company agreed to provide a cab and certain ancillary services to drivers in exchange for a fee. Changing from a lease to a sale-of-services plan was desirable, according to the company, because sales of services, unlike leases, are not subject to the Florida sales tax.

On November 1, 1976, the company presented a third contract to the drivers. This contract was similar to the second, although the rate schedule was again modified.

During November, 1976, the company informed the drivers that it wanted some drivers again to become "commission" drivers, rather than "contract" drivers. By No-

---

this refusal to be a violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act.

**2.** Section 2(3) of the Act, 29 U.S.C. § 152(3) (1976), provides:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but *shall not include* any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or *any individual having the status of an independent contractor*, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

(Emphasis added.)

**3.** Brief for Petitioner at 3.

**4.** 603 F.2d 862 (D.C.Cir.1978), *opinion accompanying denial of rehearing*, 603 F.2d 891 (1979).

vember 22, 1976, a number of drivers had done so.

The company presented a fourth contract to the "contract" drivers on January 10, 1977. This contract once again changed the rate schedule. This was the contract in effect at the time of the hearing before a Board Hearing Examiner. It provides that the company furnish a cab,[5] liability insurance, maintenance and wrecker service, training, and dispatch service. "Contract" drivers, in return, pay the company a daily fee based on one of three rate plans. Under rate I, the driver pays a fee for use of the cab for up to ten hours, plus a mileage charge. Rate II requires payment of a mileage charge only. Rate III, which is available only after 6 p. m. each day, requires payment of a flat rate with no reference to mileage.[6] A driver chooses a rate plan upon signing out with a cab,[7] and pays when he turns in the cab at the end of his stint.

The contract recites that the parties do not intend to create an employment relationship, and that drivers are to work without interference or control by the company. The term of the agreement is 12 months, but a driver's failure to purchase services for five consecutive days, or the company's refusal to deliver services, results in cancellation of the agreement. Thus, it is in effect terminable at will by either party.

The contract imposes a standard of conduct on drivers. One element is a dress code. Drivers must keep themselves "neat and clean." In practice, the employer interprets this term to require each driver to be clean shaven, and to wear a shirt with a collar. Drivers may not wear jeans, shorts, or tennis shoes. The only hat that can be worn is a company-designated "cab driver's hat." A driver who does not conform to this dress code is not given a cab.

Drivers must also adhere to the provisions of the concession agreement that gives the company the exclusive right to serve the Orlando airport. Pursuant to that agreement, drivers must keep a record of their trips so that the company can calculate the per-trip fee it owes the airport. The airport concession agreement also requires drivers to accept all passengers desiring service, whatever their destination. To meet this obligation, the company publishes rules governing the operation of cabs at the airport. Under these rules, company supervisors, called "starters," assign cabs to the queues in front of the various airline gates, and ultimately assign passengers to the cabs. A starter may skip over the cab next in line if a different vehicle, usually a van, is more appropriate for a particular passenger group. "Contract" drivers may refuse to take the passenger assigned them by the starter, but, if they do, they must leave the airport or return to the end of the line.

Drivers not serving the airport usually receive their fares by consulting with the dispatcher by radio. Upon receiving a call from a prospective customer, the dispatcher refers to a large board that contains magnets indicating the location of each driver in the fleet. The closest driver generally is assigned to pick up the new fare. "Contract" drivers theoretically may refuse to accept an assignment from the dispatcher, but several that have done so have been reprimanded by company officials. Some drivers also testified that they fear that the dispatcher will pass over them in the future if they decline assignments.

---

**5.** All cabs are owned by the company. The company sells advertising space on the cabs. Drivers do not share in the income from the ads.

**6.** However, if the driver covers more than 160 miles in his shift, a mileage fee is imposed for all miles greater than 160.

**7.** Both "contract" and "commission" drivers report to the company facility to obtain their cabs each day. "Commission" drivers work assigned shifts. "Contract" drivers may report to work, and stop working, whenever they want. However, because the office is closed between 11:30 a. m. and 2:30 p. m. each day, a driver may not begin or end work during that period. Cabs are assigned first-come, first-served. If a contract driver desires to drive the same cab each day, he must arrive before another driver is assigned to that cab. Therefore, as a practical matter, "contract" drivers report at the same time each day.

Contract drivers are free to prospect for fares independently, but most taxi customers in Orlando call the dispatcher for service. Thus, only about 10% of drivers' income is earned by such prospecting. The rest results from airport service and radio dispatches.

## II

To decide whether these facts point in the direction of employee or independent contractor status, we apply general principles of agency law:

> The extent to which drivers . . . must follow "special instructions" governing the manner in which they perform their job is relevant to whether those drivers are independent contractors or employees. . . . [T]he critical question is the company's right to control the manner in which the driver does his job.

*Local 777, Seafarers International Union v. NLRB*, 603 F.2d 862, 870–71 n. 22 (D.C. Cir.,1978). Under that test,

> an employer-employee relationship exists when the employer reserves not only the right to control the result to be achieved, but also the means to be used in attaining the result. On the other hand, where the employer has reserved only the right to control the ends to be achieved, an independent contractor relationship exists.

*Id.* at 872–73 n. 24, *quoting Twin City Freight, Inc.*, 221 N.L.R.B. 1219, 1220 (1975).

In making this inquiry, we are greatly aided by the recent opinion of this court in *Local 777, Seafarers International Union v. NLRB*, 603 F.2d 862 (D.C.Cir.,1978), and an accompanying opinion denying rehearing, 603 F.2d 891 (D.C.Cir.,1979), which found that certain Chicago taxi drivers were not employees, but independent contractors. Petitioner asserts that the facts in *Local*

777 are indistinguishable from those in the case before us. If so, our task truly will be a simple one, because we are bound by the decision of another panel of this court. However, an examination of the work relationship in *Local 777* confirms the Board's conclusion that it differs substantially from that in the case before us.

First, and perhaps most important, the Orlando company requires its drivers to maintain a trip sheet that chronicles each driver's movements and fares. *Local 777* taught that "[t]he *absence* of a trip sheet or other means of holding drivers accountable for their income is a significant indication of the *lack* of company control over the drivers." 603 F.2d at 876 (emphasis added). By that reasoning, the *presence* of a trip sheet requirement militates strongly *in favor* of employer control.[8]

Second, the Orlando company significantly regulates the hours that drivers work. In theory, a driver can arrive when he chooses and leave when he chooses. However, the central garage is closed from 11:30 a. m. to 2:30 p. m. Thus, a driver cannot start, or finish, his stint during those hours. Moreover, cabs are assigned on a first-come, first-served basis. If a driver wishes to drive the same cab each day, he must arrive at the office before that cab is assigned to someone else. To prevent this, drivers tend to report for work at the same time each day. By contrast, *Local 777* drivers had no uniform hours of work. *Id.* at 881 n.15.

Third, the Orlando company substantially controls passenger selection. This occurs both because of the radio dispatch system and the powers of the "starters" at the airport. Technically, a driver may refuse to accept the dispatcher's calls, may decline to serve the airport, and instead prospect for fares. That independence is illusory be-

---

**8.** The company appears to argue that it requires a trip sheet only because its contract to serve the airport requires it to monitor the number of pickups there for purposes of calculating the concession fee. This argument fails. It is irrelevant that the trip sheet is maintained only to help the company comply with its contractual obligations. The company was under no duty to contract to serve the airport; that it chose to do so, and negotiated an agreement to that effect, in no way reduces the control the company exercises over, and the burden imposed on, its drivers.

cause of the nature of the taxi market in Orlando. A driver simply cannot generate more than about 10% of his revenue independently. The remainder is the product of airport pickups and radio referrals, which are controlled by company starters and dispatchers. A driver is reluctant to refuse a dispatcher's call because he risks not receiving future calls—having his number "taken off the [dispatch] board"—if he proves unreliable. Similarly, drivers wishing to serve the airport must submit to the assignments of the company starters. Technically, a "contract" driver could refuse an airport fare, but in practice he probably would not, since he would then have to leave the airport or return to the end of the line. Moreover, the company retains the ultimate sanction: refusing to permit a driver to continue to drive a cab. Company owner John Mears, Sr., at a meeting with leaders of the drivers association, conceded that the contract did not contain a provision prohibiting drivers from ignoring the dispatcher's instructions. Mears candidly and tellingly added, however, that the company "still had the ultimate authority, in that [it] could refuse to rent [drivers] a cab" in the future. It is true that no driver has lost his contract for refusing a call; however, that the sanction never has been *exercised* does not diminish the potency of the *threat.* In *Local 777,* by contrast,

> there is no evidence that the companies use the threat of nonrenewal to exercise pervasive control over the manner and means in which the drivers conduct their business[.]

*Id.* at 899.

Fourth, *Local 777* emphasized that, in that case, "goodwill" inured to the benefit of the drivers themselves, not to the company, because the rent paid by the drivers was not related to the fares they collected. *Id.* at 880–81. Such is not true in the instant case. The Orlando company, by closely monitoring the drivers' trip sheets, changed the financial details of the drivers' lease arrangement seven times in six months. Through its ability, and inclination, so quickly to change the cab rental rates, the company effectively varies the amount that drivers earn depending on the total amount of business. Thus, the "goodwill" from the enterprise inures to the Orlando company, not to the drivers.[9]

Fifth, the Orlando company prescribes an extensive dress code for its drivers. They were required: (1) to wear a shirt with a collar; (2) not to wear jeans or short pants; (3) to be clean-shaven; (4) not to wear tennis shoes; (5) to wear a company-designated "cab driver's hat," if the driver chose to wear a hat. Persons not conforming to this dress code were denied cabs. By contrast, drivers in *Local 777* were expected only to be neat and clean, and not to wear sandals. *Id.* at 868, 902.

In light of all of these facts—and bearing in mind that Congress empowered the Board to assess their significance in the first instance, with limited review by this court—we are without warrant to disturb the Board's conclusion that the company maintained sufficient control over the conduct of its drivers that they should be deemed employees for purposes of the National Labor Relations Act.[10] In *Local 777,* "the motivation[ ] behind the institution of leasing was an attempt to enable the companies to be less involved in the routine difficulties of directing the daily operation of their cabs." *Id.* at 879. In this case, by

---

**9.** Similarly, the Orlando company sold and retained the income from advertisements placed on the taxicabs.

**10.** The company points out that the Internal Revenue Service has ruled that cab drivers such as these are independent contractors, and that a cab company such as this therefore need

not account for the drivers' earnings. *See* Rev. Ruling 572, 1971–2 C.B. 347. However, as *Local 777* recognized, "decisions of other agencies are not controlling," 603 F.2d at 871–72 n.22, because they are made in light of statutory policies different from those of the National Labor Relations Act. *Id.* at 876–77 n.38.

contrast, the company effectively retains control over the manner in which its drivers perform their duties. In sum, we think the record adequately supports the Board's finding that these drivers were employees, and we therefore affirm its order that the company bargain collectively with their representative.[11]

*It is so ordered.*

11. After oral argument, counsel for petitioner called to our attention the case of *Yellow Taxi Co. of Minneapolis*, 249 N.L.R.B. No. 35 (May 5, 1980) (2–1 decision), which held that certain taxi drivers were employees, not independent contractors. Petitioner here asserts that this new case is factually indistinguishable from *Local 777*, and that the Board by refusing to follow our decision in that case, is flouting this court's mandate. The *Yellow Taxi* decision is not now before us for review, so we express no opinion about it. We do note that, unlike the case before us where the Board was at some pains to point out significant factual differences between it and *Local 777*, the Board majority in *Yellow Taxi* made no reference to this court's opinion in *Local 777*.