**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL LABOR RELATIONS
BOARD,
                    *Petitioner,*

EAST BAY TAXI DRIVERS
ASSOCIATION AND BROTHERHOOD OF
TEAMSTERS, AUTO TRUCK DRIVERS,
LINE DRIVERS, CAR HAULERS, AND
HELPERS, LOCAL NO. 70,
                    *Intervenor,*

v.

FRIENDLY CAB COMPANY, INC.;
METRO-TAXICAB COMPANY, INC.;
CALIFORNIA CAB COMPANY;
GRKWSS ENTERPRISE, INC.;
METRO-YELLOW TAXICAB
COMPANY AND GREYLINE CAB CO.,
                    *Respondents.*

No. 05-73752

NLRB No.
32-CA-21613

FRIENDLY CAB COMPANY, INC.;
METRO-TAXICAB COMPANY, INC.;
CALIFORNIA CAB COMPANY;
GRKWSS ENTERPRISE, INC.;
METRO-YELLOW TAXICAB
COMPANY AND GREYLINE CAB CO.,
                    *Petitioners,*

EAST BAY TAXI DRIVERS
ASSOCIATION AND BROTHERHOOD OF
TEAMSTERS, AUTO TRUCK DRIVERS,
LINE DRIVERS, CAR HAULERS, AND
HELPERS, LOCAL NO. 70,
                    *Intervenor,*

            v.

NATIONAL LABOR RELATIONS
BOARD,
                    *Respondent.*

No. 05-73813

NLRB No.
32-CA-21613-1

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
October 18, 2007—San Francisco, California

Filed January 8, 2008

Before: Jane R. Roth,* Sidney R. Thomas, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

*The Honorable Jane R. Roth, Senior United States Circuit Judge for
the Third Circuit, sitting by designation.

**COUNSEL**

Arthur F. Rosenfeld, Acting General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, David Habenstreit, Supervising Attorney, Kathleen E. Lyon, Attorney, Meredith L. Jason, Attorney (Argued), for petitioner-respondent National Labor Relations Board.

Alexander J. Berline, Esq. (Argued), Shai Zemach, Esq., Hanson Bridgett Marcus Vlahos & Rudy, LLP, for respondents-petitioners Friendly Cab Company, Inc., et al.

David A. Rosenfeld, Esq., Caren P. Sencer, Esq. (Argued), Weinberg, Roger & Rosenfeld, A Professional Corporation,

for intervenors East Bay Taxi Drivers Association and Brotherhood of Teamsters, Auto Truck Drivers, Line Drivers, Car Haulers, and Helpers, Local No. 70.

## OPINION

CALLAHAN, Circuit Judge:

Congress enacted the National Labor Relations Act ("the Act") to protect the right of employees to participate in collective bargaining for the purpose of negotiating the terms and conditions of their employment. *See* 29 U.S.C. § 151. In an effort to avoid an application of the Act and its concomitant collective bargaining requirement, Friendly Cab Company, Inc. ("Friendly") maintains that its taxicab drivers are independent contractors, rather than employees, and are therefore excluded from the protections of the Act. After conducting an unfair labor practice proceeding, the National Labor Relations Board ("NLRB" or "Board") concluded that Friendly's taxicab drivers are employees and that Friendly violated the Act by refusing to meet and engage in collective bargaining with the East Bay Taxi Drivers Association ("Union"). Friendly now seeks review of that decision. Acting pursuant to the jurisdiction that Congress granted under Section 10 of the Act, we affirm the well-reasoned conclusion of the NLRB that Friendly's drivers are employees within the meaning of the Act. This conclusion is supported by substantial evidence that Friendly exercised considerable control over the means and manner of its drivers' performance and did not provide its drivers the ability to pursue entrepreneurial opportunities.

### I.   Background

Friendly, along with six other taxicab entities, operates out of a facility in Oakland, California, and is under the control of Surinder Singh, the chief administrator, and her husband,

Baljit Singh, the president of the company.[1] Friendly owns approximately eighty taxicabs (fifty of which are designated as airport cabs) and leases these cabs to its drivers who operate them at the Oakland International Airport and in the cities of Emeryville, Oakland, Berkeley, and Alameda, California. These leases typically state that the taxicabs are rented for seven days, renew automatically, and provide the drivers with six days of service and one day of mandatory maintenance per week. Each of Friendly's drivers is required to pay a fee or "gate," which ranges from $450 to $600 per week based on Friendly's discretion.[2] In determining this fee, Friendly takes into account the cab model, as well as the driver's driving record, driving ability, and prior accidents. Friendly has a limited number of permits to operate at the Oakland Airport, which are in high demand and are typically held by drivers with more experience. Although drivers designate which entity they want to work for, Friendly retains the discretion to assign drivers to different taxicab entities, taxicab models, and the type of cab (airport or street cabs). These leases also specify that there is no employer-employee relationship between Friendly and its taxicab drivers, and that Friendly is not responsible for withholding any federal or state taxes or providing worker's compensation insurance.

As part of the lease, Friendly's drivers agree to comply with Friendly's Taxicab Company Policy Manual ("Manual") and its Standard Operating Procedures ("SOP"). Although Friendly's Manual and SOP cover a broad range of topics that are common to the operation of a taxi service (*e.g.*, safety

---

[1]In addition to Friendly, the same employer operates Metro-Taxicab Company, Inc.; California Cab Company; Bay Area Taxi Management; GRKWSS Enterprise, Inc.; Metro-Yellow Taxicab Co.; and Greyline Cab Co. The parties stipulated that the seven entities constitute a single employer. In addition, the record indicates that it was not uncommon for the same driver to operate different taxicabs assigned to the various entities. We refer to these entities collectively as "Friendly."

[2]Friendly also operates sixteen natural gas taxicabs which command a weekly gate of $750.

concerns, non-discrimination policy, etc.), there are a number of regulations that concern Friendly's control over its drivers. For example, the Manual instructs drivers that: "[a]cceleration should be smooth," they should "[a]void abrupt stops," they should "not stop next to puddles or in front of obstacles such as signs, trees or hydrants," and that "[w]hen stopping at curbs, stop either right next to curb or out away from the curb." Friendly's Manual also imposes a dress code, which requires that all taxicab drivers "maintain good personal hygiene and dress appropriately and professionally: collared shirts with sleeves, slacks or knee-high skirts, closed shoes with socks or hose."

Friendly's SOP contains a number of relevant regulations as well. Of particular significance to this case, the SOP restricts outside business opportunities for Friendly's drivers by stating that: "[a]ll calls for service must be conducted over company provided communications system and telephone number. No private or individual business cards or phone numbers are allowed for distribution to customers as these constitute an interference in company business and a form of competition not permitted while working under the lease." The SOP also provides that "[d]rivers must service all reasonable customer calls from dispatchers." Several drivers testified that the dispatcher will ignore or bypass them if they refuse or are late to a dispatch. One driver testified that if drivers do not respond in a certain amount of time, the dispatcher reminds drivers over the radio that "we run the show, you guys are just the driver. Just drive. That's it."

Although there was conflicting testimony regarding whether Friendly's drivers had to accept credit cards, the SOP requires that drivers accept scrip and vouchers from customers.[3]

---

[3]Taxicab companies in the Oakland region participate in a program designed to assist blind, elderly, disabled customers, and passengers traveling with service animals. This program allows these individuals to pay with "scrip."

Taxicab drivers are required to respond at Friendly's discretion to dispatches for voucher service from contract accounts that Friendly Transportation (an independent company owned by the Singhs) maintains with companies such as United Parcel Service, Federal Express, Union Pacific, and the American Red Cross. It is not clear how often this occurs since the SOP indicates that Friendly Transportation's vans and sedans have primary responsibility for these corporate accounts and taxicabs are used at Friendly's discretion as a secondary option. On such occasions, Friendly reimburses drivers according to a rate list, minus a set percentage based upon the total amount of the voucher. For vouchers up to $50, Friendly keeps ten percent of the total amount; from $50 to $100, fifteen percent; from $100 to $125, twenty percent; from $125 to $200, twenty-five percent; and over $200, thirty percent.[4] There is testimony from the drivers that these flat rates can be less than the meter rate for the same trip, but the drivers do not have the ability to refuse a voucher dispatch.

In addition to the requirements contained in the Manual and the SOP, Friendly imposes a number of additional restrictions on its drivers. For example, Friendly's general manager testified that taxicab drivers are not able to sublease their vehicles to other drivers. Friendly also requires that its taxicabs carry advertisements for outside vendors on the roofs of the taxicabs. Drivers must return to the station to replace these advertisements at Friendly's discretion. Furthermore, Friendly requires that its drivers attend, at their expense, annual classes on company policies and laws dealing with discrimination. Finally, if the drivers do not comply with Friendly's policies, Friendly can terminate their leases. Friendly employs a "road

---

[4]Friendly's general manager testified that these graduated processing fees are only charged when the drivers want immediate payment and that the vouchers can be directly submitted to the appropriate company for payment. However, a Friendly driver testified that he attempted to submit vouchers directly to two airlines and was told that he had to submit the vouchers to Friendly for payment.

manager" who monitors the drivers' appearance and compliance with Friendly's policies.

As a result of tension between Friendly and its drivers, the Union was appointed as the representative of a number of Friendly's drivers. The Union filed a petition under Section 9(c) of the Act with the NLRB for a declaration that Friendly's taxicab drivers were employees and thus entitled to representation for collective bargaining purposes. Following a hearing conducted before a hearing officer, a NLRB regional director issued a Decision and Direction of Election concluding that Friendly's drivers were employees within the meaning of Section 2(3) of the Act and directing that a formal vote take place among all of the taxicab drivers to determine whether they wanted the Union as their official representative. Friendly petitioned for review, and a three-member panel of the NLRB affirmed the regional director's decision in a Decision on Review. *See Friendly Cab Co., Inc.*, 341 N.L.R.B. 722 (2004) (generally referred to as the "Underlying Representation Proceeding").

Following its certification as the exclusive collective-bargaining representative of Friendly's taxicab drivers, the Union wrote Friendly on several occasions to meet and negotiate over the terms of employment of Friendly's taxicab drivers. Friendly refused on the basis that it would seek judicial review of the Underlying Representation Proceeding. The Union subsequently filed a charge with the NLRB alleging that Friendly violated Sections 8(a)(1) and (a)(5) of the Act by refusing to participate in collective bargaining. Following a trial, an administrative law judge ("ALJ") concluded that Friendly violated the Act and recommended Friendly be "ordered to cease-and-desist, to meet and bargain on request with the Union, and, if an understanding is reached, to embody the understanding in a signed agreement." The NLRB affirmed the ALJ's decision that Friendly violated the Act and adopted the ALJ's recommended order. *See Friendly Cab Co., Inc.*, 344 N.L.R.B. No. 64, 177 L.R.R.M. (BNA) 1135 (Apr. 20,

2005) (generally referred to as the "Unfair Labor Practice Proceeding"). Friendly now seeks review of that order. Because the NLRB's decision in the Unfair Labor Practice Proceeding is based on findings made in the Underlying Representation Proceeding, the record in the Underlying Representation Proceeding is also before this court. *See* 29 U.S.C. § 159(d).

## II.   Standard of Review

In reviewing the NLRB's application of agency principles to the facts of this case, "the court should not set aside the Board's determination of the issue merely because the court, as an original matter, would have decided the case the other way. If the Board's conclusion represents a choice between two fairly conflicting views, it may not be displaced." *Merchants Home Delivery Serv., Inc. v. NLRB*, 580 F.2d 966, 973 (9th Cir. 1978) (internal quotation marks and citations omitted); *see also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995) (stating "[s]ince the task of defining the term 'employee' is one that has been assigned primarily to the agency created by Congress to administer the Act, . . . the Board's construction of that term is entitled to considerable deference") (internal quotation marks and citations omitted). However, the NLRB's decision cannot be upheld if its " 'application of the law to the facts overlooked accepted principles of the law of agency . . . .' " *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 357 (9th Cir. 1975) (citation omitted). This is because "a determination of pure agency law involve[s] no special administrative expertise that a court does not possess." *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968). Accordingly, we will uphold the NLRB's decision if it "correctly applied the law and if there is substantial evidence on the record as a whole to support its findings of fact." *Chipman Freight Servs., Inc. v. NLRB*, 843 F.2d 1224, 1225 (9th Cir. 1988) (citing *NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61, 78-79 (1985)).

### III.   Analysis

**[1]** The entire dispute between Friendly, its taxicab drivers, the Union, and the NLRB can be distilled into one question: Are Friendly's taxicab drivers "employees" or "independent contractors" under the Act?[5] If they are "employees," Friendly's drivers are protected by the Act and are entitled to collective bargaining representation. *See* 29 U.S.C. § 152(3) (defining "employees"); *United Ins.*, 390 U.S. at 255 n.1 (stating that the Act protects only employees and excludes independent contractors). Conversely, if Friendly's drivers are "independent contractors," the Act does not afford them any collective bargaining rights.[6] *Id.*

---

[5]In our review of the NLRB's order in the Unfair Labor Practice Proceeding under Section 10(f), we note that Friendly has previously stipulated that it "refused to recognize and bargain with the Union, but defends on the sole basis that the Union was improperly certified because its taxicab drivers are independent contractors and not employees." *Friendly Cab*, 344 N.L.R.B. No. 64, at *1 n.1. Accordingly, we need only consider whether Friendly's taxicab drivers were "employees" under the Act to determine whether Friendly violated the Act when it failed to meet and bargain with the Union.

[6]Congress specifically amended the Act in 1947 to exclude "independent contractors." This action was taken in response to a number of decisions by the federal courts, including the Supreme Court in *NLRB v. Hearst Publications*, 322 U.S. 111 (1944), enforcing the NLRB's expansive interpretation of the definition of the term "employee." *See NLRB v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 919 (11th Cir. 1983). The House Report on the bill that ultimately was passed to exempt independent contractors stated:

> 'Employees' work for wages or salaries under direct supervision. 'Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits.

*Id.* (quoting H.R. Rep. No. 245, 80th Cong., 1st Sess. 18 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, 309 (1948)).

**[2]** In order to distinguish an "employee" from an "independent contractor," we must undertake a fact-based inquiry applying common law principles of agency. *United Ins.*, 390 U.S. at 256 (stating that "there is no doubt that we should apply the common[ ]law agency test . . . in distinguishing an employee from an independent contractor"); *Merchants*, 580 F.2d at 972-73 (same); Restatement (Second) of Agency § 220 (1957) (common law agency principles). Although courts must look to the totality of the circumstances, "[t]he essential ingredient of the agency test is the extent of control exercised by the 'employer.' It rests primarily upon the amount of supervision that the putative employer has a right to exercise over the individual, particularly regarding the details of the work." *SIDA*, 512 F.2d at 357 (internal quotation marks and citation omitted). Additional factors that are relevant to this determination include "entrepreneurial aspects of the individual's business; risk of loss and opportunity for profit; and the individual's proprietary interest in his business." *See Merchants*, 580 F.2d at 973; *SIDA*, 512 F.2d at 359; *see also Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780-81 (D.C. Cir. 2002). We must assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, *see United Ins.*, 390 U.S. at 258, and that "[i]t is the rare case where the various factors will point with unanimity in one direction or the other." *Merchants*, 580 F.2d at 973.

We cannot displace the NLRB's conclusion that Friendly's drivers are "employees" within the meaning of the Act because there is substantial evidence in the record that Friendly exercises significant control over the means and manner of its drivers' performance. In finding that the incidents of the relationship between Friendly and its drivers militate in favor of "employee" status, we place particular significance on Friendly's requirement that its drivers may not engage in any entrepreneurial opportunities.

## A.   Evidence of Independent Contractor Status

The payment by taxicab drivers of a fixed rental rate to an employer where drivers retain all fares collected without accounting to that employer typically creates a "strong inference" that the employer does not exert control over the means and manner of the drivers' performance. *See NLRB v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 924 (11th Cir. 1983); *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. NLRB*, 603 F.2d 862, 879 (D.C. Cir. 1978); *City Cab Co. of Orlando, Inc.*, 285 N.L.R.B. 1191, 1194 (1987) ("*City Cab of Orlando I*"). The rationale behind this "strong inference" is that the employer does not have an incentive to control the means and manner of the drivers' performance when the employer makes the same amount of money irrespective of the fares received by the drivers. *See Associated Diamond Cabs*, 702 F.2d at 924; *Local 777, Seafarers*, 603 F.2d at 879; *City Cab of Orlando I*, 285 N.L.R.B. at 1194.

Here, the NLRB accepted that this "strong inference" exists because Friendly's drivers pay a flat fee and are not required to account for the amount of fares or tips they collect. *Friendly Cab*, 341 N.L.R.B. at 724. Although Friendly received the benefit of this inference, the NLRB was generous to give it. There is nothing flat about this fee since it varies among the drivers between $450 and $600, depending on their cab model, driving record, driving ability and prior accidents. *Id.* at 722. Those drivers that do not incur additional expenses for Friendly — for example, in the form of higher automobile insurance rates for poor driving records or increased costs for repairs of taxicabs damaged in accidents — are presumably rewarded with lower rental rates. Friendly's rental fees thus do in fact reflect some control over the drivers' performance.

In addition to Friendly's rental fees, the NLRB found additional indicia of independent contractor status. These include the facts that Friendly's drivers do not work set hours or a

minimum number of hours,[7] the taxicab lease agreements provide that the drivers are independent contractors, Friendly does not provide any benefits to drivers, and Friendly does not withhold social security or other taxes on behalf of the drivers. *Id.* at 724. However, the NLRB properly concluded that such factors are substantially outweighed by the evidence in the record of significant control by Friendly over the means and manner of its drivers' performance.

## B. Evidence of Employee Status

**[3]** The ability to operate an independent business and develop entrepreneurial opportunities is significant in any analysis of whether an individual is an "employee" or an "independent contractor" under the common law agency test. *See Merchants*, 580 F.2d at 973; *see also Corporate Express*, 292 F.3d at 780. Friendly's restrictions against its drivers' operating independent businesses or developing entrepreneurial opportunities strongly supports the NLRB's determination that Friendly's drivers are employees.

In *SIDA*, this court found that the taxicab drivers were independent contractors, stating: "[t]he drivers are substantially independent in their operations. They are generally free to work or not work for SIDA when they choose; they may 'moonlight' by working for other cab companies; they are free to make their own arrangements with clients and to develop their own goodwill . . . ." 512 F.2d at 357-58. Similarly, in *Merchants*, this court found that the "entrepreneurial characteristics of the owner-operators tip decidedly in favor of independent contractor status," noting that the delivery truck drivers "sometimes engage in non-Merchants business." 580

---

[7]It appears that Friendly began to restrict its taxicab drivers' leases to ten hours per day pursuant to the California Vehicle Code. *Friendly Cab*, 341 N.L.R.B. at 723. This does not constitute any degree of control since it is mandated pursuant to government regulation. *See, e.g.*, *SIDA*, 512 F.2d at 359.

F.2d at 974-75; *see also Corporate Express*, 292 F.3d at 780 (placing significance on entrepreneurial opportunities of delivery drivers in analyzing employee-independent contractor status); *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 860 (D.C. Cir. 1995) (same).

In the Underlying Representation Proceeding, the NLRB stated that "[t]he most significant evidence of Employer control in this case is that the drivers are not permitted to operate independent businesses." *Friendly Cab*, 341 N.L.R.B. at 724. A review of the record supports this conclusion. Friendly's own general manager testified that drivers can use the taxicabs only to respond to dispatches from Friendly and not for outside business. The SOP prohibits drivers from soliciting customers, stating that "all calls for service must be conducted over company provided communications system and telephone number." It also requires that drivers maintain company business cards at all times in the taxicab and prohibits drivers from distributing any private business cards or telephone numbers to customers because this would "constitute an interference in company business and a form of competition not permitted while working under the lease." Drivers cannot accept calls for service on personal cellular telephones and, in fact, cannot even use cellular telephones while driving.[8]

[4] These limitations do not allow Friendly's drivers the entrepreneurial freedom to develop their own business interests like true independent contractors. In *SIDA*, our conclusion that the taxicab drivers were independent contractors was premised largely on the fact that SIDA drivers were able "to make their own arrangements with clients and to develop their own goodwill." 512 F.2d at 357-58. Here, it is telling that Friendly's SOP mandates that its drivers must operate the

---

[8]There is nothing in the record to suggest that this restriction is related to safety rather than another form of control over the means and manner of the drivers' performance.

taxis "in such a manner as to protect the goodwill that exists between the company and its customers."

**[5]** Additional entrepreneurial characteristics — such as substantial investment in property and the ability to employ others — are also absent. *See Merchants*, 580 F.2d at 975 (finding ownership and ability to employ others as important factors indicating independent contractor status); *SIDA*, 512 F.2d at 357 (finding ownership as an important factor indicating independent contractor status); *see also Corporate Express*, 292 F.3d at 780 (stating "[t]ypically an entrepreneur not only supplies his own equipment or tools; he may also hire subordinates and work for more than one party"). Friendly's taxicab drivers do not own the taxicabs, but must lease them from Friendly. Friendly also prohibits its drivers from employing others by preventing the subleasing of its taxicabs. One former driver testified that while he was hospitalized, he was instructed by Mrs. Singh that drivers were prohibited from subleasing the vehicles, even to other Friendly drivers.

**[6]** Another factor supporting the NLRB's determination that Friendly's drivers are employees is the evidence that Friendly sought to control the means and manner of its drivers' performance by regulating the manner in which they drive, imposing a strict disciplinary regime, requiring drivers to carry advertisements without receiving revenue, requiring drivers to accept vouchers subject to Friendly's "processing fees," imposing a strict dress code, and requiring training in excess of government regulations. All of these factors support the NLRB's determination that Friendly's drivers are employees.

**[7]** Friendly maintains direct control over the performance of its drivers' duties by exercising "discretion to determine which entity a driver is assigned to, the model of the vehicle assigned to a driver, . . . and whether a driver may drive an airport cab." *Friendly Cab*, 341 N.L.R.B. at 724. Friendly's Manual further instructs drivers in the manner they should

accelerate and stop their vehicles, as well as factors they should consider in choosing where to stop their taxicabs. Thus, Friendly's interest in controlling the means and manner of its drivers' performance extends to the actual details of the operation of the taxicabs.

In assessing control, courts have also focused on the presence, or lack thereof, of discipline imposed by a taxicab company on its drivers. In *City Cab Co. of Orlando, Inc. v. NLRB*, 628 F.2d 261 (D.C. Cir. 1980) ("*City Cab of Orlando II*"), the court found it significant that drivers were reluctant to refuse either a dispatcher's call for fear of not receiving future dispatches or an airport assignment because they would have to return to the end of the airport taxicab line. *Id.* at 265 (concluding that taxicab drivers were employees); *see NLRB v. O'Hare-Midway Limousine Serv.*, 924 F.2d 692, 695 (7th Cir. 1991) (finding company's "right to fine or reprimand the drivers for failure to comply with company procedures" as support for concluding limousine drivers were employees); *Stamford Taxi, Inc.*, 332 N.L.R.B. 1372, 1384 (2000) (finding taxicab drivers that refused dispatch calls were "subject to discipline, denial of further dispatched calls, or lease termination" as support for concluding taxicab drivers were employees). Conversely, in *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366 (D.C. Cir. 1983), the court held the lack of a disciplinary regime was an important factor leading to the determination that the taxicab drivers were independent contractors. *Id.* at 376-77; *see also C.C. Eastern*, 60 F.3d at 858 (finding company's lack of a conventional disciplinary system was an indicator of independent contractor status). Distinguishing the disciplinary system in *City Cab of Orlando II*, the court in *Yellow Taxi of Minneapolis* found that the drivers were free to refuse any radio call from the dispatcher. 721 F.2d at 377. In fact, the chief dispatcher testified that the drivers were "free to refuse orders for runs, without penalty, and dispatchers are so instructed." *Id.* Such is not the case here.

Friendly exercised substantial control over its drivers through a strict disciplinary regime. Significantly, Friendly

disciplines its drivers for any refusal to cooperate with Friendly's dispatcher. Friendly's SOP states that "[d]rivers must service all reasonable customer calls from dispatcher." Friendly's drivers testified that they are disciplined if they refuse or are late to a dispatch. Drivers are also disciplined when they disagree with management. Mrs. Singh assessed a fifty dollar fine to one driver who disagreed with her and purportedly told him that "you open a mouth in front of me, now you have to pay the penalty." Furthermore, in order to monitor drivers' appearance and compliance with Friendly's policies, Friendly employs a "road manager" who has the authority to not only warn drivers, but to suspend or terminate lease agreements. One driver testified that the road manager unilaterally changed the terms of the lease (including the weekly gate and preset fees to repair a taxicab) to punish him for an accident. The evidence reveals that if the taxicab drivers do not perform their duties in an acceptable manner, Friendly punishes them using the most effective tool available: taking money out of the drivers' income.

Friendly's requirement that its taxicabs carry advertisements is additional evidence of control because drivers are subject to Friendly's discretionary requests to change advertisements. *Friendly Cab*, 341 N.L.R.B. at 724. These requests require that the driver sit idle while advertisements are changed and result in the driver losing potential fares. Also, drivers testified that they complained to Friendly that they did not want advertising signs for various companies on top of their taxicabs, but were told they did not have a choice in the matter. One driver testified that Friendly required him to change the advertising up to once every twenty days, requiring him to wait each time at the company's premises between fifteen minutes and one hour.

The type of control Friendly exercises over its drivers exceeds that found in the typical case in which a company requires its workers place advertisements on work vehicles. In *Carnation Company v. NLRB*, 429 F.2d 1130 (9th Cir. 1970),

this court found that Carnation's requirement that its dairy distributors maintain advertisements on their work vehicles did not evidence an employer-employee relationship. *Id.* at 1132; *see also Associated Diamond Cabs*, 702 F.2d at 921 (concluding that income from advertisements that went to taxicab company was "irrelevant to the issue of an employer's control over the lessees"). Similarly, in *City Cab of Orlando I*, a taxicab company's requirement that a driver return to its facility in order for a mechanic to place decals listing the new telephone number of the company was found to not be the type of control normally exercised by an employer over an employee. 285 N.L.R.B. at 1206. This was because the decals primarily benefitted the taxicab drivers and the general public. *Id.* In this case, Friendly's requirement constitutes significantly greater control. Friendly's advertising requirement represents a form of control that inures to the benefit of Friendly at the financial expense of the drivers.

Friendly's requirement that its drivers accept vouchers is yet further evidence of control. Some courts have found that requiring taxicab drivers to accept flat voucher fees is not evidence of sufficient control by itself to indicate "employee" status. *See, e.g.*, *Yellow Taxi of Minneapolis*, 721 F.2d at 371; *Air Transit, Inc. v. NLRB*, 679 F.2d 1095, 1100 (4th Cir. 1982). However, Friendly exercises greater control through the graduated processing fees it charges drivers when they redeem vouchers. While it is unclear how often it occurs, Friendly's drivers are required at Friendly's discretion to transport passengers and packages pursuant to contracts between Friendly Transportation and various companies. *Friendly Cab*, 341 N.L.R.B. at 723. These mandated voucher trips can pay lower amounts than the meter rates, and the voucher reimbursement system charges Friendly's drivers graduated processing fees ranging from ten to thirty percent of the total amount of the voucher. *Id.* Similar to the advertising requirement, Friendly's voucher requirement exceeds the type of control typically exercised over independent contractors.

Friendly's extensive, mandatory dress code for all of its taxicab drivers also constitutes additional evidence of control. In *City Cab of Orlando II*, the court cited the extensive dress code the taxicab company required of its drivers as one of the factors that led the court to conclude the taxicab drivers were employees. 628 F.2d at 265. There, the drivers were required to wear a shirt with a collar, not to wear jeans or short pants, to be clean-shaven, not to wear tennis shoes, and, if the driver chose to wear a hat, it had to be a designated "cab drivers hat." *Id.* Friendly's dress code is very similar to the one in *City Cab of Orlando II*. Although this court and others have not given a dress code requirement much weight, Friendly's extensive dress code is an additional factor supporting the NLRB's determination. *See, e.g.*, *SIDA*, 512 F.2d at 358-59 (finding independent contractor status where drivers were required to "be neat and courteous, display the SIDA identification on their dome lights and uniforms"); *Carnation*, 429 F.2d at 1132 (finding that the fact distributors did not have to wear uniforms was indicative of independent contractor status); *see also C.C. Eastern*, 60 F.3d at 858 (finding that company's lack of control over the drivers' dress or appearance was indicative of independent contractor status).

Friendly's training policy outlined in its Manual, which incorporates both local government regulations and company-specific regulations, also constitutes another minimal indicium of control over the drivers. *See Friendly Cab*, 341 N.L.R.B. at 722-24. While the incorporation of government regulations into a company's manual is not evidence of an employer-employee relationship, *see SIDA*, 512 F.2d at 359, the NLRB reasonably found that Friendly's training requirements exceed those required by the City of Oakland's ordinance and constitute some degree of control over the drivers. *Cf. Carnation*, 429 F.2d at 1132 (noting that the fact distributors were not required to undergo training at company's request was indicative of independent contractor status); *Air Transit*, 679 F.2d at 1098 (finding in independent contractor analysis that "drivers receive no type of training and are not

given road tests to evaluate their driving skills"). Friendly describes its mandatory two-day training class as being "in addition to the class conducted by the City of Oakland Police Taxi Detail." It covers sensitivity training, operating procedures, hands-on practical training, record keeping, and local geography training. Like the dress code requirement, we find the training requirement supports the NLRB's determination that Friendly's drivers are employees.

## IV.  Regional Director's Decision as Evidence of Arbitrariness

**[8]** Finally, we reject Friendly's contention that the NLRB's decision in *Friendly Cab* was arbitrary. Friendly's argument is based on the fact that the same regional director that concluded Friendly's taxicab drivers are employees in the Underlying Representation Proceeding also concluded in a separate representation proceeding that drivers for a rival taxicab company, Veteran's Cab Corporation, are independent contractors. We find Friendly's argument unpersuasive because it is the three-member panel's Decision on Review — not the regional director's Decision and Direction of Election — that is being reviewed pursuant to Section 9(d) of the Act, and, in any event, *Veteran's Cab* is distinguishable.

Under Section 3(b) of the Act, Congress provided the NLRB with the authority to delegate "any or all" of its powers to a three-member panel and to delegate "to its Regional Directors the [authority under Section 9] to determine the appropriate bargaining units, to direct elections, and to certify the results of such elections, subject to review by the Board." *Ritz-Carlton Hotel Co. v. NLRB*, 123 F.3d 760, 762 (3d Cir. 1997) (citing Pub. L. 86-257, 73 Stat. 542 (1959) (codified as amended at 29 U.S.C. § 153(b) (1983))). Acting pursuant to this authority, the NLRB promulgated rules codified at 29 C.F.R. § 102.67 "delegating the initial decisionmaking on representation issues to the Regional Directors, but retaining the authority in the Board to make the final administrative deci-

sion." *Id.* (citing 26 Fed. Reg. 3889 (May 4, 1961) (codified as amended at 29 C.F.R. § 102.67)). A decision by a regional director becomes final either if the parties fail to request a review by the Board or the Board denies such a request. *See* 29 C.F.R. § 102.67(f). Should the Board grant a request for review, it may affirm or reverse the regional director's order, or determine that another disposition of the matter is appropriate. *See* 29 C.F.R. § 102.67(j).

Friendly ignores the fact that the Board — acting through a panel — granted Friendly's request to review the regional director's decision and concluded that Friendly's drivers are "employees" within the meaning of the Act.[9] *See Friendly Cab*, 341 N.L.R.B. 722. The panel's decision then became the final administrative decision that we review. *See* 29 C.F.R. § 102.67. That the regional director may have acted differently in another case is of little concern. *Cf. Corporate Express*, 292 F.3d at 781 (addressing challenge to the Board's decision as being inconsistent with that of a regional director in another case and stating that "the decision of a Regional Director does not bind the Board"). Accordingly, we find Friendly's argument that the regional director's decision constitutes evidence of arbitrariness to be misplaced.

Moreover, Friendly's reliance on *Veteran's Cab* is flawed because Friendly exercises substantially more control over its taxicab drivers than Veteran's does over its drivers. The weekly gate charged by Veteran's to its drivers depends solely on the type of cab they drive (city cab, airport, or clean natural gas) and does not vary from driver-to-driver based on discretionary factors such as driving record or driving ability. *See Veteran's Cab Corp. & East Bay Taxi Drivers Ass'n,*

---

[9]We note that this review is far from a "rubberstamp." In affirming the regional director's decision, the panel disagreed with the decision by the regional director on the question of whether the voucher system supports a finding that Friendly's drivers are "employees." *See Friendly Cab*, 341 N.L.R.B. at 722.

N.L.R.B. Case 32-RC-5050, at 3 (Sept. 30, 2002). The regional director also found that Veteran's drivers "are free to, and do, solicit independent business through the use of cell phones, pagers, etc., and they are free to use their cabs for personal reasons. They may use the Employer's dispatch system, but are not required to do so." *Id.* at 7-8. Veteran's drivers are also permitted to distribute business cards with their cell phone and pager numbers. *Id.* at 4. Drivers are freely permitted to pick up fares from any location including various taxi stands, hotels and transit stations. *Id.* at 8. One driver testified that eighty percent of his business involves picking up passengers at various train stations. *Id.* at 4. Thus, the regional director found that "drivers are not dependent on the Employer's dispatch system for their income." *Id.* at 8. Veteran's drivers also have the ability to sublease their taxicabs with Veteran's permission, are not subject to discipline for refusing dispatches, and are not required to abide by a dress code. *Id.* at 4-5. Veteran's also has no rules or limitations on their drivers' use of taxicabs for personal business or vacation. *Id.* at 4. In fact, Veteran's does not maintain any written policy manual or standard operating procedure. *Id.*

Thus, we do not find any support for Friendly's position that the NLRB's decision is arbitrary based on the actions of the regional director in adjudicating the representation proceedings in this case and in *Veteran's Cab*. Even if we could examine the regional director's decisions for evidence of arbitrariness, we would find that they are sound because Veteran's Cab exercises substantially less control over its drivers.

## V. Conclusion

[9] In sum, we conclude there is substantial evidence in the record to support the NLRB's determination that Friendly's taxicab drivers are "employees" within the meaning of the Act.[10]

---

[10]Friendly asserts for the first time before this court that the NLRB erred by not considering Friendly's airport taxicab drivers separately from its

The NLRB relied on a number of factors that in their totality compel a finding of employee status, the most significant of these being Friendly's prohibition on its drivers' operating an independent business and developing entrepreneurial opportunities with customers. Additional salient indicia of control by Friendly over the means and manner of its drivers' performance include: (1) regulating the details of how drivers must operate their taxicabs, (2) imposing discipline for refusing or delays in responding to dispatches, (3) requiring drivers to carry advertisements without receiving revenue, (4) requiring drivers to accept vouchers subject to graduated "processing fees," (5) prohibiting subleases, (6) imposing a strict dress code, and (7) requiring training in excess of government regulations. Although some of these factors individually may not constitute substantial control, the NLRB reasonably concluded that these factors taken together overcame any evidence of independent contractor status. We therefore affirm the NLRB's decision.

**AFFIRMED.**

---

street drivers. Section 10(e) of the Act constitutes a jurisdictional bar to this court considering claims not raised before the NLRB. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982) (stating that Section 10(e) of the Act bars the courts from considering issues not raised before the Board) (citations omitted).